## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| HOWARD S. WILLINGHAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 9-540-B-W |
| | ) | |
| THE TOWN OF STONINGTON, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS**

**I.**

**RESPONSE TO DEFENDANT'S ALLEGED FACTS**

Plaintiff responds as follows to the facts alleged in Defendant's Statement of Material Facts:

1.      Defendant Town of Stonington ("Town") is a town located in Hancock County, Maine. (Ex. B, Def.'s Responses to Pl.'s First Request for Admissions ¶ 1.)

**RESPONSE:** Admitted.

2.      Plaintiff Howard S. Willinghan ("Willinghan") is an individual residing in Winter Harbor, Maine. (Ex. A, Willinghan Dep. 5:23-24.)

**RESPONSE:** Admitted.

3.      The Town is governed by a group of five selectpersons. (Ex. A, 29:5-10.)

**RESPONSE:** Admitted.

4.      Willinghan was hired as Town Manager for the Town in January of 2007. (Ex. C, Plaintiff's Responses to Defendant's Interrogatories ¶ 3.)

**RESPONSE:** Qualified: He was hired in November 2006 to begin work on January 2, 2007. (Ex. D: 1; Ex. 5, Ex. 17: 1.)

1

5.      Willinghan executed a contract entitled "Town Manager's Employment Agreement ("Employment Agreement") with the Town. (Ex. A 62:19-65:4; Ex. C ¶ 3(17)-(19); Ex. D, Employment Agreement.)

**RESPONSE:** Admitted.

6.      Section 3 of the Employment Agreement is titled "Conditions of Employment." (Ex. D § 3.)

**RESPONSE:** Admitted.

7.      Among the Conditions of Employment listed in the Employment Agreement is that Willinghan's term of employment was "for a period of three years, running from January 1, 2007 through December 31, 2009." (Ex. D § 3(a).)

**RESPONSE:** Admitted.

8.      Notwithstanding this anticipated term of employment, the Employment Agreement further provides for termination of Willinghan's employment by the Town prior to the expiration of his contractual term of employment as follows:

Nothing in this agreement shall prevent, limit, or otherwise interfere with the right of the Board of Selectmen to terminate the services of Employee with cause as provided for in M.R.S.A. 30A § 2633, subject to the provisions set forth in Section 4, paragraph (b) of this Agreement.

(Ex. D § 3(d).)

**RESPONSE:** Admitted.

9.      Just as the Employment Agreement provides for Willinghan's termination by the Town prior to the expiration of his employment term, it provides that Willinghan may voluntarily resign his own employment prior to the expiration of his employment term as

follows:

Nothing in this agreement shall prevent, limit, or otherwise interfere with the right of Employee to resign at any time from this position with the Town, subject to the provisions set forth in Section 4, paragraph (b) of this Agreement.

(Ex. D § 3(e).)

**RESPONSE:** Admitted.

10.     Section 4 of the Employment Agreement is entitled "Termination Conditions and Pay." (Ex. D § 4.)

**RESPONSE:** Admitted.

11.     Under Section 4(a) of the Employment Agreement,

In the event Employee is terminated by the Board of Selectmen . . . while Employee is willing and able to perform the duties of Town Manager, Town shall continue to pay Employee's salary and benefits for a period of ninety (90) days following the specified date of termination, subject to [certain conditions irrelevant to this matter.]

(Ex. D § 4(a).)

**RESPONSE:** Admitted.

12.     Section 4(b) of the Employment Agreement further provides, in relevant part, that Willinghan may

voluntarily resign the position of Town Manager at any time upon thirty (30 days written notice to the Town. In the event of such termination, Employee shall not be entitled to receive the termination pay provided for in paragraph (a) of this section.

(Ex. D § 4(b).)

**RESPONSE:** Admitted.

3

13.     For many years prior to Willinghan's employment with the Town he suffered from a series of medical issues involving his back. (Ex. A 16:25-21:21; Ex. C ¶ 3(2).)

**RESPONSE:** Admitted.

14.     Willinghan first injured his back while working for Verizon in 1982. (Ex. A 17:1- 6; Ex. C ¶ 3(1).)

**RESPONSE:** Admitted.

15.     Following that original injury, and prior to commencing work for the Town, Willinghan underwent five separate surgeries on his spine over the course of the following fifteen years in an effort to render him pain free. (Ex. A 17:7-19:12.)

**RESPONSE:** Qualified. Defendant's record citation does not support the contention that the sole purpose of the surgeries was to render Willinghan pain free; rather the surgeries were necessary "stabilization procedures" to treat Willinghan's serious spinal disease, including severe degenerative disc disease, canal stenosis and an annular tear, by stabilizing the unstable portion of his spine to minimize the risk of damage to his nerves and spinal cord. (Dr. Just dep., Ex. I 10:9-12, 11:5-21, 17: 19, 28:3-6, 12-14, 31:15-25, 32:1-15, 63:18, 71:11-13.)

16.     Those efforts failed as Willinghan has never been pain free from at least 1984 through when he began working for the Town in 2007. (Ex. A 19:13-20:25; Ex. E, Peter W. Just, M.D. Dep. at 9:8-10.)

**RESPONSE:** Qualified. Admitted that Willinghan has never been pain free from at least 1984 through when he began working for the Town in 2007. Denied that his back surgeries "failed." (Ex. A 40:4-9.) Defendant's record citation does not support the contention that the sole purpose of the surgeries was to render Willinghan pain free; rather the surgeries were necessary "stabilization procedures" to treat Willinghan's serious spinal disease, including severe degenerative

disc disease, canal stenosis and an annular tear, by stabilizing a portion of his spine to minimize the risk of damage to his nerves and spinal cord. (Ex. I 10:9-12, 11:5-21, 17: 19, 28:3-6, 12-14, 31:15-25, 32:115).) The surgeries did not categorically fail as some of the surgeries did succeed in stabilizing an unstable portion of his spinal column, thereby treating his serious spinal disease.(Ex. A 40:4-9.)

17.     In November of 2006, approximately one month before Willinghan began his employment with the Town, Willinghan had a lumbar MRI examination conducted after noticing a "decline in walking tolerance and an increase in pain" in his back and legs that Willinghan characterized as when his condition "started feeling a little different." (Ex. A 21:19-24.)

**RESPONSE:** Qualified.  Willinghan reported on August 22, 2007 to Dr. Just "that over the past six months [he] had noticed decline in walking tolerance and an increase in pain but no other essential changes" but "it really did become evident that it started to really bother [him] until August" 2007.  (Ex. A 20:11-18, 21:16-25, 22:1.)

18.     The pain and "decline in walking tolerance" "started to really bother" Willinghan in August of 2007. (Ex. A 21:24-22:1.)

**RESPONSE:** Admitted.

19.     Although his back and leg issues had become an acute issue in August of 2007, Willinghan decided to continue with his plans to attend the "Delmarva Motorcycle rally" that same month as part of a vacation scheduled for between September 10, 2007 and September 17, 2007. (Ex. A 13:7-16, 22:2-5, 90:5-8)

**RESPONSE:** Admitted.

20.     During this vacation, Willinghan's motorcycle was his sole means of transportation. (Ex. A 13:15-21.)

**RESPONSE:** Admitted.

21.     On this trip, Willinghan rode his motorcycle an approximate 688 miles from Maine to Maryland. (Ex. A 13:19-24)

**RESPONSE:** Admitted.

22.     While in Maryland, Willinghan was in Baltimore "for a couple of days" during which time he travelled approximately thirty to fifty miles a day on his motorcycle. (Ex. A 13:25-14:5.)

**RESPONSE:** Admitted.

23.     Willinghan then travelled approximately 120 miles from Baltimore to Delmarva to attend the Delmarva motorcycle rally. (Ex. A 14:5-7.)

**RESPONSE:** Admitted.

24.     Willinghan attended the Delmarva festival from Friday through Sunday, then rode his motorcycle back to Maine. (Ex. A 14:10-17.)

**RESPONSE:** Admitted.

25.     Willinghan acknowledges that, even under normal conditions regarding his back issues, he was "not as comfortable as I wish I could be" while riding a motorcycle as a result of his back issues. (Ex. A 14:18-20.)

**RESPONSE:** Qualified.  The record citation does not support the contention that Willinghan was referring to his level of comfort "even under normal conditions." Rather, he testified that he had "been riding [his motorcycle] for years with back problems." (Ex. A 15:1-4.)

26.     Willinghan decided not to alter his plans to use his motorcycle as his sole means of transportation to attend the Delmarva festival despite, prior to the trip, being aware that "something was different which had caused [him] to become concerned" regarding his back issues. (Ex. A 15:1-5.)

6

**RESPONSE:** Qualified. The Defendant's record citation does not support the contention that Willinghan made a decision not to alter his plans. Rather, he testified that he had "been riding [his motorcycle] for years with back problems." (Ex. A 15:1-4.) Dr. Just testified that during his intial meeting with Willinghan in August 2007, he would not have recommended to Willinghan that he not ride a motorcycle, and that "the average person probably would have done the same" as Willinghan and gone on the motorcycle vacation. (Ex. I 21:24-25, 22:1-12, 25: 9-20.) Willinghan's efforts to remain active, including his motorcycling, were good for his health. (Ex. I 61:3-21.)

27.     When asked whether his back pain became "more acute after the motorcycle rally", Willinghan responded "[p]rogressively more . . . ." (Ex. A 22:6-8.)

**RESPONSE:** Qualified. He also testified that he had "been riding [his motorcycle] for years with back problems." (Ex. A 15:1-4.) and "it was starting to bother me before [his September 2007 motorcycle trip]. I mean, I started to know something was wrong." (Ex. A 22:2-5.). The motorcycle rally in September 2007 was not a factor in Willinghan's back condition that Dr. Just treated beginning in August 2007. (Ex. I 60:18-22.)

28.     Following his vacation, Willinghan had an August 27, 2007 appointment with Dr. Just in which in which Dr. Just notified Willinghan that he thought Willinghan had "segmental instability" in his back and that, if he did, he "was going to need another operation . . . [that would not be a] routine stabilization." (Ex. E 27:1-28:6.)

**RESPONSE:** Denied. As noted above in Defendant's SMF ¶ 19, the vacation was between September 10, 2007 and September 17, 2007, which is after, not before, the August 27, 2007 appointment with Dr. Just. (Ex. A 90: 5-8.) The Defendant's citation does not support the assertions about the August 27 visit, but rather they relate to the September 20 visit.

29.     At no point at or before that August 27 appointment with Dr. Just did Dr. Just

suggested any work accommodations in light of Willinghan's back issues. (Ex. E 27:3-6.)

      **RESPONSE:** Qualified. Willinghan never saw Dr. Just before August 27, 2007. Dr. Just's record of the August 27, 2007 initial appointment explains that he would make no recommendations until after he obtained a copy of the November 2006 MRI, Willinghan underwent a new set of lumbar x-rays, and they had a follow-up visit to discuss the information obtained. (Ex. I 22:7-9 ("I didn't have enough information when I first met him to give him any specific recommendations or – or restrictions; *see also*. (Ex. I 64:24-25, 65:1-15; Medical Records of Dr. Just, Ex. J.:65)

      30.      Willinghan had another appointment with Dr. Just in September in which Dr. Just reiterated his opinion that it was "very likely" that Willinghan would require surgery. (Ex. E 31:15-32:24.)

      **RESPONSE:** Qualified. Dr. Just's record of the August 27, 2007 initial appointment explains that he would make no recommendations about further treatment, including possible surgery, until after he obtained a copy of the November 2006 MRI, Willinghan underwent a new set of lumbar x-rays, and they had a follow-up visit to discuss the information obtained. (Ex. I 22:7-9 ("I didn't have enough information when I first met him to give him any specific recommendations or – or restrictions."); Ex.J.: 65.) Dr. Just's record of the September 20, 2007 appointment documents that he offered epidural injections and physical therapy as palliative care, and that he believed Willinghan "will ultimately need another operation" so he "will petition [h]is workrmen's comp insurer for authorization for a surgical consultation." (Ex. J.). As of September 20, 2007, Dr. Just agreed to try epidural injections that might relieve Willinghan's pain for several months and make it easier for him to work while he pursued a surgical consultation. (Ex. I 65: 16-25, 66:1-2.) Dr. Just is a board-certified anesthesiologist who specializes in pain medicine. (Ex. I 3:21- 24.)

      31.      As of the September appointment, Dr. Just never recommended that Willinghan's

work be restricted in any fashion. (Ex. E 33:17-33:22.)

**RESPONSE:** Qualified.  The record citation does not support the contention that Dr. Just never recommended that Willinghan's work be restricted, only that nothing in Dr. Just's September note documented such a conversation. (Ex. E 33:17-33:22.) Rather, Dr. Just testified that at the September 20 appointment he was concerned that because Willinghan had "instability of the L3-4 level, that he could injure himself further… I probably told him, be careful; I probably told him that if you fall, you could suffer a more serious injury. But I don't really detail here anything of specifically what I told him. . . . But I told him he certainly needed a surgical consultation and that I thought it was very likely that a surgeon would recommend a fusion." (Ex. E 32:1-24.) Dr. Just also testified that "I don't always document everything that the patient tells me" and that "I don't always put everything that my patient tells me in the notes. (Ex. I 37: 15-16, 51:5-6.)

32.    Willinghan attended a meeting of the Town's Board of Selectmen ("Board") on September 24, 2007. (Ex. A 36:11-15.)

**RESPONSE:** Admitted.

33.    At that meeting, Willinghan first informed the Board that he was having significant back problems and notified them that he was seeing Dr. Just regarding those back problems. (Ex. A 36:18-24.)

**RESPONSE:** Qualified.  Mr. Willinghan first informed the Board in 2006 that he had significant back problems during his first in person job interview with Defendant, when Selectman John Robbins asked Willinghan why he walked with a cane. (Ex. C at p. 3 ¶ 11; Admitted by Defendant at Answer and Affirmative Defenses of Defendant at ¶¶16-17; *see also* Complaint and Demand For Jury Trial and Injunctive Relief Sought at ¶¶16-17.)

34.    At that meeting, Willinghan made no request for family medical leave. (Ex. A

9

36:25-37:2.)

       **RESPONSE:** Denied. (Ex. K. Larrabbe Dep. 20: 9-25; Ex. 17: 3).

     35.     At the time of that meeting, Willinghan understood he had no right to family medical leave. (Ex. A 37:3-14.)

       **RESPONSE:** Qualified. Willinghan understood that he was eligible for discretionary medical leave under the Town's Personnel Policy provision for leaves of absence without pay up to 60 days under Article XII(B).  (Ex. A 37:3-7; Ex. L, Duncan Dep.  99:5-25, 100:1-4, Ex. 22: 6.)  He also had a right to reasonable accommodation under the state and federal laws requiring reasonable accommodation for employees with disability, including the possible reasonable accommodation of medical leave. (Ex. L 85:19-24, 86:18-25, 87:1-8, Ex. 9.)

     36.     At that meeting, there was no mention at all of Willinghan potentially needing any accommodation regarding his back issues. (Ex. A 38:2-4.)

       **RESPONSE:** Denied. (Ex. K 20: 9-25; Ex. 17: 3.)

     37.     In mid-October of 2007 Willinghan had an "off the cuff" conversation with the then Town Clerk, Kathleen Billings-Pezaris ("Pezaris") in which Willinghan discussed his back condition and generally what might be done regarding its worsened condition. (Ex. A 28:1-4; Ex. C ¶ 3(25).)

       **RESPONSE:** Qualified. Willinghan explained further in part of the testimony cited that in speaking with Pezaris he told her that his doctor had told him that he could be given some injections the doctor thought would help, but at some point he was going to need surgery. (Ex. A 27:20-25, 28:1-6.) He also explained in the testimony cited that he told Pezaris on about October 13, 2007, "about my worsened condition and discussed possible ways my disability could be accommodated" and she told him that she could provide back up for [him] if [he] needed assistance to accommodate

his disability." (Ex. C ¶¶ 3(25-26).)

38.        Shortly thereafter, Willinghan also had a conversation with Richard Larrabee ("Larrabee"), the Chairman of the Board, with Willinghan's specific intention in having that meeting being to discuss his medical condition. (Ex. A 28:5-13; Ex. C ¶ 3(27).)

**RESPONSE:** Qualified. Willinghan explained further in part of the testimony cited that in speaking with Larrabee on October 14, 2007, that he told him that his doctor had told him that he could be given some injections the doctor thought would help, but at some point he was going to need surgery. (Ex. A 27:20-25, 28:1-6.)  He also explained in the testimony cited that Larrabee made a statement to the effect of "Don't worry about anything, get yourself fixed up, we can work with this  . . . .;" that Larrabee also discussed his future with the Town and told Willinghan that he was pleased with his performance and there was no reason why accommodation could not be made for his disability;" and that Larrabee never asked Willinghan to provide any medical documentation. (Ex. C ¶¶ 3(27-31).)

39.        At neither meeting did Willinghan provide or offer any medical records regarding his medical condition. (Ex. A 28:1-17.)

**RESPONSE:** Qualified. Larrabee did not request medical records during the October 14 meeting. (Ex. A 28:14-15; Ex. C ¶ 3(31).) No official of the Town ever requested medical records from Willinghan before the Selectmen requested his resignation. (Ex. C ¶ 3(55).)

On October 5, 2007 Willinghan notified the full Board in writing as follows: "I am receiving the first epidermal shot Wednesday afternoon so I will have to take that afternoon off. I should be well enough to come in on Thursday. I have not been able to schedule an appointment with the orthopedist in Bangor yet; I have to get approval from my former employer for any additional procedures to be performed." (Ex. 6; Ex. K 13:9-25, 14:1-24.) It was reasonable of

Willinghan to wait to get approval before he went to see an orthopedist so he wouldn't have to pay for it himself. (Ex. K 16:3-9.) It would not be fair for the Board to expect Willinghan to provide documentation about his medical condition from a specialist when he had not yet seen the specialist. (Ex. K 16: 19-24.)

On October 15, 2007, Willinghan offered to the Selectmen to provide his medical records and received no response; on October 22 Willinghan offered to provide the Town medical records from Dr. Just by picking them up at his appointment on Wednesday October 24.  (Ex. A 28:18-25, 29:1-4; 43:16-25, 44:1-4.)  Although Willinghan offered to obtain medical documentation of his need for a reasonable accommodation for his disability, no employee, agent, or representative of the Town ever responded to his offer before the Selectmen requested his resignation on Monday October 22, 2007. (Ex. C ¶ 3(54).)

40.     Willinghan attended a Board meeting on October 15, 2007. (Ex. A 38:19-24.)

**RESPONSE:** Admitted.

41.     At that meeting, Willinghan requested that the Board go into executive session. (Ex. A 38:22-24.)

**RESPONSE:** Admitted.

42.     During that executive session, Willinghan requested that the Board afford him family medical leave for his back condition. (Ex. A 38:25-39:2.)

**RESPONSE:** Qualified.  Medical leave was requested as one alternative possibility. (Ex. A 38:25-39:2)

43.     When the Board asked how long of a leave he would require, Willinghan responded that he did not know. (Ex. A 39:3-8.)

12

**RESPONSE:** Admitted.

44.     Willinghan further told the Board that he probably would require back surgery. (Ex. A 39:9-12.)

**RESPONSE:** Admitted.

45.     Willinghan told them that he did not know how long that surgery would keep him from working. (Ex. A 39:13-15.)

**RESPONSE:** Admitted.

46.     Willinghan offered two suggested accommodations that he represented would permit him to continue working as Town Manager. (Ex. A 41:12-42-5; Ex. C ¶ 3(33).)

**RESPONSE:** Qualified.  The two suggestions were not the only accommodations suggested by Willinghan. (Ex. A 41:12-25, 42:1-2.)

47.     Willinghan's first suggested accommodation was to work from home, at irregular hours including at "two o'clock in the morning" and come into the Town office for scheduled office hours and appointments. (Ex. A 41:16-20, 42:20-43:5.); Ex. C ¶ 3(33.)

**RESPONSE:** Qualified.  Admitted that Willinghan suggested an accommodation that included working from home, but denied that the suggested accommodation was as described above, which description is not supported by the Defendant's record citation.  Willinghan explained that his suggestion to the Selectmen on October 15, 2007 included "restricted hours in the office, asked them whether I could make appointments to see people, do most of my work at home or part of my work at home." (Ex. A 41:12-20.) The record citation does not support the contention that. Willinghan's suggestion to the Selectman on October 15, 2007 included a suggestion to the Selectmen that his proposed hours would regularly include two o'clock in the morning; rather, Willinghan explained at his deposition  in direct response to questioning about  what the advantage of  "work from home as opposed to work in the

office" that one possible advantage was that in terms of his medical condition, "literally if I couldn't sleep at two o'clock in the morning I could do town work, but if I had to lay down or had to relax or something in any way, I could take a 20 minute break or like that, get myself back into shape and recharge my batteries a little bit and go back to working. As I said, if someone needed me, I was less than a mile from the town hall. I could be in there at any time. I got a complete office in my house." (Ex. A 42:20-43:5.) He further clarified at his deposition that he expected as part of his suggested reasonable accommodation that he would be "working at 2 a.m. and laying down during the day" only "sporadically." (Ex. A 43:6-9.) Frequent changes in body position reduced Willinghan's pain and made him feel better. (Ex. I 13: 1-9.) It would be a lot easier for Willinghan to change his body position frequently when not in a public situation. (Ex. I 60:7-10).

48.     Willinghan's second suggested accommodation was to take an unpaid leave of absence "until we found out exactly what the situation would be." (Ex. A 41:20-22.)

**RESPONSE:** Qualified. Willinghan's second suggested accommodation was to take an unpaid leave while undergoing a series of epidural treatments, and he explained to the Selectmen that after his next appointment with his doctor on October 24, 2007, he should be able to give them additional information concerning what accommodation and medical procedures might be required. (Ex. A 91:3-25, 92:1-7; Ex. C ¶ 3(33),(35).) As of September 20, 2007, Dr. Just agreed to try epidural injections that might relieve Willinghan's pain for several months and make it easier for him to work while he pursued a surgical consultation. (Ex. I 65: 16-25, 66:1-2.)

49.     These were the only two suggested accommodations Willinghan ever presented to the Board. (Ex. A 60:10-13; Ex. C 3¶ (33).)

**RESPONSE:** Denied. The two suggestions were not the only accommodations suggested by

14

Willinghan. (Ex. A 41:12-25, 42:1-2.)  The record cited by Defendant does not support the contention,

only that the accommodation. Willinghan suggested included these two accommodations. (Ex. A

60:10-13; Ex. C 3¶ (33).)

     50.    Neither of these accommodations was suggested by Dr. Just. (Ex. E 33:14-

23.)

     **RESPONSE:** Denied. Dr. Just told Willinghan that these accommodations would be

appropriate modifications of his working conditions. (Ex. C ¶ 3(42)). Dr. Just testified that

he believed Willinghan "was a very credible man," and that "it is very possible" that

Howard and he did discuss reasonable accommodations to allow him to perform his job

duties.  (Ex. I 23:1-2, 50:13-25, 51:1-9.) Defendant's record citation does not support the

contention.

     51.    Willinghan presented the Board with no doctors' notes or other medical records

regarding his condition either at or prior to the October 15, 2007 Board meeting. (Ex. A 39:16-

18.)

     **RESPONSE:** Qualified.  No official of the Town ever requested medical records from

Willinghan before the Selectmen requested his resignation. (Ex. C ¶ 3(55).). On October 15, 2007,

Willinghan offered to the Selectmen to provide his medical records and received no response; on

October 22 Willinghan offered to provide the Town medical records from Dr. Just by picking them up

at his appointment on Wednesday October 24.  (Ex. A 28:18-25, 29:1-4; 43:16-25, 44:1-4.) Although

Willinghan offered to obtain medical documentation of his need for a reasonable accommodation

for his disability, no employee, agent, or representative of the Town ever responded to his offer

before the Selectmen requested his resignation on Monday October 22, 2007. (Ex. C ¶ 3(54).)

     52.    Willinghan presented no time table either at or prior to the October 15, 2007

meeting for when he might return to his position as Town Manager were he to take unpaid leave. (Ex. A 39:16-18, 43:16-21.)

**RESPONSE:** Qualified. On October 15, when Willinghan suggested the accommodation for unpaid leave while undergoing a series of epidural treatments, he explained to the Selectmen that after his next appointment with his doctor on October 24, 2007, he should be able to give them additional information concerning what accommodation and medical procedures might be required. (Ex. A 91:3-25, 92:1-7; Ex. C ¶ 3(33),(35).)

53. At the October 15, 2007 Board meeting, with no objection from Willinghan, Pezaris was approved by the Board as Assistant Town Manager. (Ex. A 47:4-8.)

**RESPONSE:** Denied. (Ex. A 48:18-24.)

54. Willinghan had another appointment with Dr. Just on October 18, 2007 at which Dr. Just recommended to Willinghan that he discontinue his work entirely. (Ex. E 36:6-38:6.)

**RESPONSE:** Qualified. As of October 18, 2007, Dr. Just was not saying that it would be unreasonable for Willinghan to attempt to continue working, and he believed that Willinghan might have been able to continue a sedentary job if he was careful. (Ex. I 63:4-25, 64:1.) Dr. Just told Willinghan at the October 18, 2007 appointment that working part of the time from home or a temporary medical leave would be appropriate modification of his working conditions. (Ex. C ¶ 3(42).) Dr. Just testified that he believed Willinghan "was a very credible man." and that "it is very possible" that on October 18, 2007, that Howard and he did discuss reasonable accommodations to allow him to perform his job duties. (Ex. I 23:1-2, 50:13-25, 51:1-9.) Dr. Just testified that as of October 18, 2007: a temporary medical leave would have been appropriate for Willinghan to request from his employer; that it would have been reasonable for Willinghan to attempt to continue working with modified job duties; that there would have been

16

health advantages for Willinghan to work from home part of the time; that he is "quite sure" he discussed working part time with Willinghan; that if he had been careful in the workplace as town manager performing purely sedentary duties, it would have been reasonable for Willinghan to attempt to continue doing that job after October 18; and that he did discuss job modifications with Willinghan but he is not sure of the date. (Ex. I 58:17-25, 59:1-25, 60: 1-15, 70:5-24.) Dr. Just testified that his documentation of the October 18, 2007 advice that Willinghan discontinue work was "probably more restrictive than it needed to be, but probably to impress upon him that he needed to be careful." (Ex. I 36:6-38:6.) Dr. Just also provided documentation dated January 24, 2008, that "Willinghan's medical condition has not prevented him from performing his essential job duties as town manager for the town of Stonington." (Ex. I 43:13.)

55. At that appointment, Dr. Just did not recommend that Willinghan modify his work in any way. (Ex. E 37:23-25.)

**RESPONSE:** Denied. As of October 18, 2007, Dr. Just was not saying that it would be unreasonable for Willinghan to attempt to continue working, and he believed that Willinghan might have been able to continue a sedentary job if he was careful. (Ex. I 63:4-25, 64:1.) Dr. Just told Willinghan at the October 18, 2007 appointment that working part of the time from home or a temporary medical leave would be appropriate modification of his working conditions. (Ex. C ¶ 3(42).) Dr. Just testified that he believed Willinghan "was a very credible man" and that "it is very possible" that on October 18, 2007, that Howard and he did discuss reasonable accommodations to allow him to perform his job duties. (Ex. I 23:1-2, 50:13-25, 51:1-9.) Dr. Just testified that as of October 18, 2007: a temporary medical leave would have been appropriate for Willinghan to request from his employer; that it would have been reasonable for Willinghan to attempt to continue working with modified job duties; that there would have been

health advantages for Willinghan to work from home part of the time;  that he is "quite sure" he discussed working part time with Willinghan; that if he had been careful in the workplace as town manager performing purely sedentary duties, it would have been reasonable for Willinghan to attempt to continue doing that job after October 18; and  that he did discuss job modifications with Willinghan but he is not sure of the date. (Ex. I  58:17-25, 59:1-25, 60: 1-15, 70:5-24.)  Dr. Just testified that his documentation of  the October 18, 2007 advice that Willinghan discontinue work was "probably more restrictive than it needed to be, but probably to impress upon him that he needed to be careful."  (Ex. I 36:6-38:6.) Dr. Just also provided documentation dated January 24, 2008, that "Willinghan's medical condition has not prevented him from performing his essential job duties as town manager for the town of Stonington." (Ex. I 43:13.)

56.     At that appointment, Dr. Just did not provide W illinghan with a note regarding restrictions in Willinghan's work. (Ex. E 38:24-39:1.)

**RESPONSE:** Admitted.

57.      At no point prior to January 2008 did Willinghan ask for or receive an out-of-work note. (Ex. E 33:23-34:2.)

**RESPONSE:** Admitted.

58.     At the October 15, 2007 meeting, Dr. Just did not indicate to Willinghan how long he was going to need to miss work due to his back issues. (Ex. E 39:5-7.)

**RESPONSE:** Qualified. The October meeting of Dr. Just and Willinghan was not on October 15, 2007 but on October 18, 2007, and Dr. Just was optimistic that the second epidural injection scheduled for October 24 would be more effective than the first injection on October 10. (Ex. I 34:3-14, 35:8-15, 40:3-4.) To the extent an injection provided some pain relief, it would make it easier for Willinghan to do his job duties and to concentrate.

18

(Ex. I 62: 7-22.)

59.     Mr. Willinghan attended a meeting of the Board on October 22, 2007. (Ex. A 57:21-58:7.)

**RESPONSE:** Admitted.

60.     Willinghan did not discuss his medical issues with the Board, or any members thereof, between the conclusion of the October 15, 2007 Board meeting and the October 22, 2007 Board meeting. (Ex. A 58:7-9.)

**RESPONSE:** Admitted.

61.     At the October 22, 2007 meeting, Willinghan told the Board that he had catastrophic failure in his back and that he could not continue to work under his current working conditions. (Ex. A 58:20-59:4.)

**RESPONSE:** Qualified. Willinghan told the Board that he could not continue to work without some form of accommodation in his working conditions. (Ex. A 58:20-59:4.) He also explained to the Board "that because of my very serious back condition I required modifications in my work conditions, and requested that they discuss possible accommodations for my disability." (Ex.  C ¶ 3(43).)

62.     At that meeting, Willinghan told the Board that he "understood with my contract I worked at their discretion." (Ex. A 59:14-15.)

**RESPONSE:** Admitted.

63.     In response, members of the Board expressed their opinion on the hardship on the Town that would be caused by not having the Town Manager conduct his work primarily in Town Hall and that the Town "needed somebody at the helm." (Ex. A 59:16-24.)

**RESPONSE:** Qualified. The record citation does not support the contention that the

"Board expressed their opinion on the hardship on the Town that would be caused by not having the Town Manager conduct his work primarily in Town Hall." In the deposition testimony cited by Defendant, Willinghan testified that "There was no mention [by the Board] of how that the town would be impacted" or "that they couldn't do it," but instead the Board simply made the general statement that they "needed somebody at the helm." (Ex. A 59:16-24.)

64.     The Board then stated that the issue regarding Willinghan's proposed accommodations was a personnel issue that needed to be discussed in an executive session. (Ex. F, Billings-Pezaris Dep. at 144:13-20, 235:18-25.)

**RESPONSE:** Qualified. After Willinghan "had gone through [his] possible accommodation scenario," then he "was faced with five people just sitting there staring at [him]." (Ex. A 59:24-25, 60:1.) Defendant's record citation does not support the contention that the Board made the above statement that personnel issues "needed" to be discussed in an executive session.

65.     The Board invited Willinghan to attend the executive session to discuss the matter further, but Willinghan declined the invitation to attend the executive session and simply got up and left the Board meeting. (Ex. F 229:8-14, 233:6-7, 234:7-12.)

**RESPONSE:** Qualified.  Admitted that Willinghan declined to attend the executive session. Denied that Willinghan "simply got up and left the Board meeting."  The Board went into executive session first and then Willinghan went home. (Ex. A 60:3-6.) After the Board made their motion to go into executive session, they asked everyone to leave, at which point Willinghan left. (Ex. F 237:9-14.)

66.     The Board then went into executive session. (Ex. A 60:3-4.)

**RESPONSE:** Admitted.

67.      Shortly thereafter, Willinghan received a call from Larrabee stating that the Board had voted to request Willinghan's resignation. (Ex. A 60: 6-8.)

**RESPONSE:** Admitted.

68.      Willinghan  responded that he would submit his resignation the following day. (Ex. A 60:8-9.)

**RESPONSE:** Admitted.

69.      By letter dated October 23, 2007, Willinghan formally resigned as Town Manager. (Ex. A 60:21-61:2; Ex. G, October 23, 2007 Willinghan Resignation Letter.)

**RESPONSE:** Admitted.

70.      In this letter, Willinghan wrote, in part, that

It is with the utmost regret that based on my present physical condition, the advice of medical advisors, my obligation to the Town of Stonington and at the request of the Select Committee, that I tender my resignation as Town Manager, effective immediately.

(Ex. A 61:3-11; Ex. G.)

**RESPONSE:** Admitted.

71.      Willinghan was aware at the time of his resignation that the Employment Agreement provided for a procedure by which the Board could terminate his employment. (Ex. A 62-22-24.)

**RESPONSE:** Admitted.

72.      Nothing in the Employment Agreement required Willinghan to resign upon the Board's request. (Ex. D.)

**RESPONSE:** Denied.  It was an implied condition of Mr. Willinghan's employment

agreement that he resign if requested to do so by the Board. (Ex. A 65:7-17.) All town managers know that they should resign if the Selectmen unanimously ask you to resign. (Ex H Billings-Pezaris Dep., 190:5-24.)

73.         Willinghan understood that there was a difference between resignation and termination under the Employment Agreement. (Ex. A 65:1-4.)

**RESPONSE:** Qualified.  Willinghan's interpretation of the contract as applied to his situation was that the Board terminated his employment. (Ex. A 65:1-17.)

74.         At no point either before or after his resignation did Willinghan provide medical records of any kind to the Town regarding the medical condition that led to his resignation. (Ex. A 28:18-29:7, 43:22-23, 65:22-66:1.)

**RESPONSE:** Qualified. No official of the Town ever requested medical records from Willinghan before the Selectmen requested his resignation. (Ex. C ¶ 3(55)). On October 15, 2007, Willinghan offered to the Selectmen to provide his medical records and received no response; on October 22 Willinghan offered to provide the Town medical records from Dr. Just by picking them up at his appointment on Wednesday October 24.  (Ex. A 28:18-25, 29:1-4; 43:16-25, 44:1-4.)  Although Willinghan offered to obtain medical documentation of his need for a reasonable accommodation for his disability, no employee, agent, or representative of the Town ever responded to his offer before the Selectmen requested his resignation on Monday October 22, 2007. (Ex. C ¶ 3(54).) Dr. Just provided documentation to the Town dated January 24, 2008, that "Willinghan's medical condition has not prevented him from performing his essential job duties as town manager for the town of Stonington."  (Ex. I 43:13.)

75.         Willinghan did not at any time attempt to appeal the Board's request that he resign. (Ex. A 66:3-6.)

**RESPONSE:** Qualified. The Board governs the Town. (Ex. A 29:5-10.) There is no higher authority within the Town's procedures for an internal appeal from the decisions of the Board. Willinghan did make an external appeal by filing timely complaints with the Maine Human Rights Commission and this Court.

## II.

### PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

76.    Willinghan suffered an on-the-job spinal injury while working for Verizon in 1982. (Ex. C ¶ 3(1).)

77.    Since that injury, he has undergone seven spinal reconstruction surgeries. (Ex. C 3(2).)

78.    As a result of his injuries, he walks with a cane and has been in pain continuously for more than 20 years. (Ex. C ¶ 3(5).)

79.    Despite the severity of his disability, he built an entirely new career, earning a Bachelor's degree and then a Master's degree from Johns Hopkins University School of Business. (Ex. C ¶ 3(6).)

80.     Willinghan was hired to be Town Manager for the Town of Stonington in November 2006 to begin work on January 2, 2007. (Ex. D: 1; Ex. 5, Ex. 17:1.)

81.    During his first in-person interview, Selectman John Robbins asked Willinghan why he walked with a cane. (Ex. C ¶ 3(10).)

82.    In response to Mr. Robbins' question, Willinghan gave the Board of Selectmen an overview of the history and the then current status of his medical condition. (Ex. C ¶ 3(11).)

83.    Mr. Willinghan received very positive feedback about his performance, successfully completed his six-month probationary period,  and in July 2007 was offered a five-

year contract; Mr. Willinghan opted instead for a three year contract because he hoped that his work bringing economic development to the Town would result in a substantial merit raise when the contract was renegotiated in three years. (Ex. C ¶ 3(13)-(18).)

84.    Based on the positive feedback he had received and the three year contract he had been provided, Willinghan purchase a home in Stonington, and his wife and daughter moved from Maryland to Stonington; he intended to remain in the Town Manager position for at least seven years until he retired. (Ex. C ¶¶ 1, 3(8, 19-21).)

85.    In August 2007, Willinghan began to experience increased back pain and on August 27, 2007 he had his first appointment with Dr. Just, who t is a board-certified anesthesiologist who specializes in pain medicine. (Ex. C ¶ 3(22); Ex. I 3:21- 24.)

86.    Dr. Just's record of the August 27, 2007 initial appointment explains that he would make no recommendations about further treatment, including possible surgery, until after he obtained a copy of the November 2006 MRI, Willinghan underwent a new set of lumbar x-rays, and they had a follow-up visit to discuss the information obtained. (Ex. I 22:7-9 ("I didn't have enough information when I first met him to give him any specific recommendations or – or restrictions."), Ex. J: 55.)

87.    Dr. Just diagnosed Willinghan as of September 20, 2007 with spinal instability, annular tear, severe degenerative disk disease, and canal stenosis. (Ex. C ¶ 3(22), Ex. I 27:15-25, 28:1-14).) Dr. Just's record of the September 20, 2007 appointment documents that he offered epidural injections and physical therapy as palliative care, and that he believed Willinghan "will ultimately need another operation" so he "will petition [h]is workrmen's comp insurer for authorization for a surgical consultation." (Ex. J.:68.) As of September 20, 2007, Dr. Just agreed to try epidural injections that might relieve Willinghan's pain for several months and make it easier for him to work while he pursued a surgical consultation. (Ex. I  65: 16-25, 66:1-2.)

24

88.     On October 5, 2007 Willinghan notified the full Board in writing as follows: "I am receiving the first epidermal shot Wednesday afternoon so I will have to take that afternoon off. I should be well enough to come in on Thursday. I have not been able to schedule an appointment with the orthopedist in Bangor yet; I have to get approval from my former employer for any additional procedures to be performed." (Ex. 6; Ex. K 13:9-25, 14:1-24.) It was reasonable of Willinghan to wait to get approval before he went to see an orthopedist so he wouldn't have to pay for it himself. (Ex. K 16:3-9.) It would not be fair for the Board to expect Willinghan to provide documentation about his medical condition from a specialist when he had not yet seen the specialist. (Ex. K 16:19-24.)

89.     On October 10, 2007, Willinghan underwent the first in a series of epidural treatments.  This treatment failed to provide him with relief from his increased pain. (Ex. C ¶ 3(24)).

90.     On or around October 13, 2007, Willinghan told Town Clerk Kathleen Billings-Pezaris about his worsened condition and discussed possible ways his disability could be accommodated. (Ex. C ¶ 3(25).)

91.     Ms. Billings-Pezaris told Willinghan that she could provide back up for him if he needed additional assistance to accommodate his disability. (Ex. C ¶ 3(26).)

92.     On October 14, Willinghan went to speak to Mr. Larrabee about Willinghan's condition. (Ex. C 3(27).)

93.     Mr. Larrabee reassured Willinghan that a medical problem was something the Town could deal with. (Ex. C ¶ 3(27).)

94.     Mr. Larrabee was very positive and supportive and made a statement to the effect of "Don't worry about anything, get yourself fixed up, we can work with this  . . . ." (Ex. C ¶ 3(28).)

95.     Mr. Larrabee also discussed Willinghan's future with the Town and told Willinghan that he was pleased with Willinghan's performance and there was no reason why accommodation could not be made for his disability. (Ex. C ¶ 3(30).)

96.     At the weekly Selectmen's Meeting, held the very next evening on October 15, Willinghan informed the rest of the Board of his condition and the possibility that he might need surgery. (Ex. C ¶ 3(32).)

97.     Willinghan understood that he was eligible for discretionary medical leave under the Town's Personnel Policy provision for leaves of absence without pay for up to 60 days under Article XII(B).  (Ex. A 37:3-7; Ex. L 99:5-25, 100:1-4, Ex. 22: 6.) He also had a right to reasonable accommodation under  the state and federal laws requiring reasonable accommodation for employees with disability, including the possible reasonable accommodation of medical leave. (Ex. L  85:19-24, 86:18-25, 87:1-8, Ex. 9.)

98.     At that October 15 meeting with the Selectmen, Willinghan proposed several reasonable accommodations that would allow him to perform the duties of his position despite his disability. (Ex. C ¶ 3(33).)

99.      These possible accommodations included working from home part of the time, with scheduled office hours and appointments in the Town Office, or in the alternative taking an unpaid leave while undergoing a series of epidural treatments. (Ex. C ¶ 3(33).)

100.      Willinghan further explained his suggestion of a restructured work schedule to the Selectmen on October 15, 2007, including the possibility of  "restricted hours in the office, asked them

whether I could make appointments to see people, do most of my work at home or part of my work at home." (Ex. A 41:12-20.)  He also explained some possible advantages of "work from home as opposed to work in the office," including that "literally if I couldn't sleep at two o'clock in the morning I could do town work, but if I had to lay down or had to relax or something in any way, I could take a 20 minute break or like that, get myself back into shape and recharge my batteries a little bit and go back to working. As I said, if someone needed me, I was less than a mile from the town hall.  I could be in there at any time. I got a complete office in my house." (Ex. A 42:20-43:5.) He expected as part of his suggested reasonable accommodation that he would be "working at 2 a.m. and laying down during the day" only "sporadically."  (Ex. A 43:6-9.) Frequent changes in body position reduced Willinghan's pain and made him feel better. (Ex. I 13: 1-9.) It would be a lot easier for Willinghan to change his body position frequently when not in a public situation. (Ex. I 60:7-10).

101.    Willinghan  also  suggested the possible accommodation  to take an unpaid leave while undergoing a series of epidural treatments, and he explained to the Selectmen that after his next appointment with his doctor on October 24, 2007, he should be able to give them additional information concerning what accommodation and medical procedures might be required. (Ex. A 91:3-25, 92:1-7; Ex. C ¶ 3(33),(35).)

102.    Willinghan also suggested then Town Clerk Billings-Pezaris could do his job during his absence and she was qualified to do so. (Ex K 21:10-25.) She took over as the town manager right after Willinghan resigned on October 23, 2007 and remains the Town Manager. (Ex. K 22:1-7.). She had previously served as acting Town Manager for the Town for about three months in early 2000 while also continuing to serve as the full-time Town Clerk. Ex. H 5:17-25, 6:1-15.

103.    Despite Willinghan's request to discuss his potential needed accommodation as Town Manager, there was no response from the Board concerning any possible accommodation. (Ex. C ¶ 3(34).)

104.    Willinghan suggested that the Board of Selectmen research the Americans with Disabilities Act and refrain from taking any further official actions until the next Weekly Meeting. (Ex. C ¶ 3(36).)

105.    At the October 15 meeting, the Selectmen did not discuss or comment on Willinghan's suggested accommodations. (Ex. C ¶ 3(37).) The Selectmen understood that Mr. Willinghan did not qualify for medical leave under the federal and state family and medical leave acts and thus that under the law they did not have to give Mr. Willinghan medical leave. (Ex. K 26:4-23; Ex. 17 at p. 3-4.)

106.    The Selectmen did not indicate that his suggested accommodations would in any way be a hardship on the Town. (Ex. C ¶ 3(37).)

107.    The Selectmen also did not suggest any other possible accommodations that would be acceptable to them, or in any way engage Willinghan in a good faith dialogue about possible reasonable accommodations. (Ex. C ¶ 3(37).)

108.    At the October 15 meeting, the Board of Selectmen appointed the then Town Clerk, Ms. Billings-Pezaris, to be "Assistant Town Manager," a position that had not previously existed. (Ex. C ¶ 3(38).)

109.    This promotion was voted on, passed and signed without any previous notice to Willinghan, who was then the Town Manager and had sole responsibility for all employee matters under the Town Charter. (Ex. C ¶ 3(39).)

110.    Willinghan was not given any opportunity to provide any input prior to this important employment decision. (Ex. C ¶ 3(40).)

111.    On October 16, the day after Willinghan revealed his worsened condition to the Board of Selectmen and requested reasonable accommodations for his disability, Selectman Evelyn Duncan came into the Town Office and used a phone there within obvious earshot of Willinghan to call the Maine Municipal Association. (Ex. C ¶ 3(41).)

112.    During that call, she discussed ways that Willinghan's employment could be terminated. (Ex. C ¶ 3(41).)

113.    This conversation was conducted where Willinghan could obviously hear the conversation about his employment being terminated. (Ex. C 3(41).)

114.    Selectman Duncan never mentioned during this conversation with the Maine Municipal Association that Willinghan had a medical disability and had requested a reasonable accommodation the previous day. (Ex. C ¶ 3(41).)

115.    Maine Municipal Association sent written advice to Selectman Duncan on October 17 explaining that Willinghan may have a legal right to a medical leave of absence or other reasonable accommodations under the Maine Human Rights Act, the Americans with Disabilities Act and the Town's own personnel policies. (Ex. 9; Ex K 5:24-25, 6:1-23, 7:23-25, 8:1-2.) This written advice was provided to all of the Board members by about October 18, 2007. (Ex. K 5:24-25, 6:1-19.)

116.    On October 18, Willinghan's doctor told him that he was at risk for catastrophic failure of his spine unless his work conditions were modified. (Ex. C ¶ 3(42).)

117.    Willinghan's doctor agreed that the accommodations he had proposed to the Board of Selectmen would be appropriate modifications of his working conditions. (Ex. C ¶ 3(42).)

118.    On October 22, 2007, Willinghan again went before the Board of Selectmen, told them that because of his very serious back condition he required modifications in his work conditions, and requested that they discuss possible accommodations for his disability. (Ex. C ¶ 3(43).)

119.    Willinghan advised the Selectmen that he was able to continue the assigned duties of his position with accommodation. (Ex. C ¶ 3(44).)

120.    Willinghan again suggested several reasonable accommodations. (Ex. C ¶ 3(45).)

121.    He requested four to six weeks of unpaid medical leave (Ex. K 27:14-25, 28:1-9, 38:14-19, Ex. 3A: 4.)

122.    The Board knew that Willinghan preferred a medical leave over having his employment end. (Ex K 28:5-9, 46:15-25, 47:1-8; Ex. 3A: 4)

123.    Willinghan also requested that the Board of Selectmen wait two days until he had a second epidural treatment on October 24 before making any decision about his employment. (Ex. C ¶ 3(47).)

124.    The Selectmen did not suggest any alternative to Mr. Willinghan's proposal to have the Town Clerk fill in for him while he was on medical leave. (Ex. H 31:25, 32:1-3).

125.    In response to Willinghan's second request for reasonable accommodations, the Board of Selectmen went into executive session. (Ex. C ¶ 3(48).)

126.    Before commencing the executive session, the Board of Selectmen asked everyone to leave, and Willinghan left as requested. (Ex. F 237:9-14.)

127.    After the executive session, the five Selectmen unanimously made a formal motion to request Willinghan's resignation "as he has informed the Board he is unable to perform his duties."  (Ex. 3A:4; Ex. H 118:9-15.)

128.    As Stonington's current town manager has acknowledged, it would be hard for a town manager to continue functioning if all five Selectmen passed a motion requesting his resignation and all town managers know that you should resign if requested to do so by the Selectmen. (Ex. H 190:5-24.).

129.    Willinghan protested the request for his resignation but, aware that the Selectmen were considering the termination of his employment, agreed to submit a letter of resignation the next day in response to the Selectmen's demands. (Ex. C ¶ 3(50).)

130.    The day after Willinghan was forced to submit his resignation, he underwent a successful epidural treatment which relieved the increased back pain he had been suffering and eliminated any immediate need for reasonable accommodations. (Ex. C ¶ 3(51).)

131.    On October 29, 2007, at the first weekly meeting of the Stonington Board of Selectmen after Willinghan resigned, the Board of Selectmen appointed Ms. Billings-Pezaris to the position of "Permanent Town Manager."  (Ex. H 84:4-85:7.)

132.    The Selectmen did not take any steps to seek external candidates for the position before appointing Ms. Billings-Pezaris to the Town Manager position. (Ex. H 85:4-23.)

133.    The Town of Stonington represented in writing to the Maine Human Rights Commission that Ms. Billings-Pezaris wasn't hired as Permanent Town Manager until November 5, 2007 and was only appointed as "interim" Town Manager on October 29, 2007.  (Ex. 17 at 5.). Ms. Billings-Pezaris was made permanent, not interim, Town Manager on October 29, 2007.(Ex. H. 84:4-85:7.)

134.    On about October 30, 2007, the Town hired a substitute, who had previously been the Deputy Town Clerk for the Town and knew the Town's financial software, to assist in the Town office on a temporary basis. (Ex. H 112:8-25, 113:1-2, 120:18-22, Ex.K 23:11-24, 24:1-2). Town Manger Billings Pezaris hired this substitute this quickly even though she had not begun looking until after October 22 and the substitute was the first person she asked to provide temporary assistance. Ex. H 118:16-25, 120:7-20).

135.    Mr. Larrabee never asked Willinghan to provide any medical documentation. (Ex. A 28:14-15, Ex. C ¶ 3(31).)

136.    On October 15, 2007, Willinghan offered to the Selectmen to provide his medical records and received no response; on October 22 Willinghan offered to provide the Town medical records from Dr. Just by picking them up at his appointment on Wednesday October 24.  (Ex. A 28:18-25, 29:1-4; 43:16-25, 44:1-4.)

137.    Although Willinghan offered to obtain medical documentation of his need for a reasonable accommodation for his disability, no employee, agent, or representative of the Town ever responded to his offer before the Selectmen requested his resignation. (Ex. C ¶ 3(54).)

138.    The Selectmen found Mr. Willinghan to be honest and believed his oral reports about his medical situation. (Ex. K 29:10-21.).No employee, agent, or representative of the Town ever requested that Willinghan provide medical documentation before the Selectmen requested his resignation. (Ex. C ¶ 3(55).

139.    The Board of Selectmen never entered into any dialogue with Willinghan about possible accommodations for his disability before demanding his resignation and never indicated to him that any of the accommodations he suggested would cause an undue hardship to the Town. (Ex. C ¶ 3(56).)

Date: September 7, 2011                    Respectfully submitted,


                                          /s/ David G. Webbert
                                          David G. Webbert, Esq.
                                          Johnson & Webbert, LLP
                                          160 Capitol Street, Suite 3, PO Box 79
                                          Augusta, Maine 04332-0079
                                          Tel: 207-623-5110
                                          dwebbert@johnsonwebbert.com

                                          Attorney for Plaintiffs


                            CERTIFICATE OF SERVICE

        I hereby certify that today this filing was electronically filed with the Clerk of Court
using the CM/ECF system which will send notification of such filing to the following: Jonathan
W. Brogan, Esq. and David A. Goldman, Esq., Norman, Hanson & Detroy, LLC


                                          /s/ David G. Webbert
                                          David G. Webbert
                                          Johnson & Webbert, LLP
                                          160 Capitol Street, Suite 3, PO Box 79
                                          Augusta, Maine 04332-0079
                                          Tel: 207-623-5110
                                          dwebbert@johnsonwebbert.com