UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| HOWARD S. WILLINGHAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:09-cv-00540-JAW |
| | ) | |
| TOWN OF STONINGTON, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

A former town manager claims his employer discriminated against him by requesting his resignation after he asked for a reasonable accommodation for his disability. The Court denies the town's motion for summary judgment concluding there are genuine issues of material fact as to whether the town improperly rejected the plaintiff's demand for reasonable accommodation and whether it retaliated against him because of his request by constructively discharging him.

## I. STATEMENT OF FACTS

### A. Procedural Background

On October 22, 2009, Howard S. Willinghan filed a complaint against the Town of Stonington (Stonington or Town), alleging disability discrimination, denial of reasonable accommodations, and retaliation. *Compl.* (Docket # 1). In 2010, the Court denied Stonington's motion to dismiss the federal claims. *Mot. to Dismiss Pl.'s Federal Claims* (Docket # 5); *Order Denying Mot. to Dismiss Pl.'s Federal Claims* (Docket # 9). On July 22, 2011, Stonington moved for summary judgment

and attached a statement of material facts. *Mot. for Summ. J.* (Docket # 26) (*Def.'s Mot.*); *Def.'s Statement of Material Fact* Attach. 1 (Docket # 26) (DSMF). Mr. Willinghan responded on September 7, 2011 to both the motion and the statement of material facts. *Pl.'s Resp. to Def.'s Statement of Material Facts* (Docket # 31) (PRDSMF); *Pl.'s Objection to Def.'s Mot. for Summ. J.* (Docket # 32) (*Pl.'s Opp'n*), and submitted a statement of additional material facts. *Pl.'s Statement of Additional Material Facts* (Docket # 31) (PSAMF). On October 7, 2011, Stonington filed its reply and response to the additional material facts. *Reply to Resp. to Mot. for Summ. J.* (Docket # 35) (*Def.'s Reply*); *Def.'s Resp. to Pl.'s Statement of Additional Material Facts* (Docket # 36) (DRPSAMF). On October 7, 2011, Mr. Willinghan moved for oral argument, *Pl.'s Mot. for Oral Argument on Def.'s Mot. for Summ. J.* (Docket # 37), and the Court heard oral argument on February 27, 2012.

## B.   Factual Background[1]

### 1.   Howard S. Willinghan's Longstanding Back Condition

For many years before Mr. Willinghan's employment with Stonington he suffered from a series of medical issues involving his back. DSMF ¶ 13; PRDSMF ¶ 13. Mr. Willinghan first injured his back while on the job for Verizon in 1982. DSMF ¶ 14; PRDSMF ¶ 14; PSAMF ¶ 76; DRPSAMF ¶ 76. Over the course of the next fifteen years, following that original injury and before starting work for Stonington, Mr. Willinghan underwent five separate surgeries on his spine in an effort to render him pain free, and since that injury, he has undergone a total of

---

[1] In accordance with "conventional summary judgment praxis," the Court recounts the facts in the light most favorable to Mr. Willinghan's theory of the case, consistent with record support. *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002).

seven spinal reconstruction surgeries.[2]  DSMF ¶ 15; PRDSMF ¶ 15; PSAMF ¶ 77;

DRPSAMF ¶ 77.  As a result of his injuries, he walks with a cane and has been in

pain continuously for more than 20 years.[3]  PSAMF ¶ 78; DRPSAMF ¶ 78.  Despite

the severity of his disability, he built an entirely new career, earning a Bachelor's

and Master's degree from Johns Hopkins University School of Business.  PSAMF

¶ 79; DRPSAMF ¶ 79.  During his interview with the town of Stonington (Town) for

the position of Town Manager, Selectman John Robbins asked Mr. Willinghan why

he walked with a cane and in response, Mr. Willinghan gave the Board of Selectmen

(Board or Selectmen) an overview of the history and the then current status of his

medical condition.[4]  PSAMF ¶¶ 80-81; DRPSAMF ¶¶ 80-81.

---

[2] Mr. Willinghan interposed a qualified response to the Town's paragraph 15, asserting that becoming pain free was not the sole reason for the surgeries.  PRDSMF ¶ 15.  The Court views that qualified response as a quibble.  Presumably the surgeons performed the spinal surgeries with hope that the patient would become pain free and, even if the purpose of some of these surgeries was to stabilize, this would not eliminate reduction or elimination of pain as a desirable result.

In the Town's paragraph 15, the Town says that after the original injury and before becoming employed by the Town, he had undergone five back surgeries, an assertion Mr. Willinghan admitted. DSMF ¶ 15; PRDSMF ¶ 15.  In Mr. Willinghan's paragraph 77, he says he has undergone seven spinal reconstructive surgeries, an assertion the Town admitted.  PSAMF ¶ 77; DRPSAMF ¶ 77.

[3] The Town proposed a similar statement in paragraph 16.  DSMF ¶ 16.  The difference between the Town's paragraph 16 and Mr. Willinghan's paragraph 78 is *de minimis*.  Viewing the facts in the light most favorable to the non-movant, the Court has recited the Plaintiff's version.

[4] Each time Mr. Willinghan refers in his statement of additional material facts to a statement by a Town official or by himself, the Town objected on the ground that the statement is impermissible hearsay.  DRPSAMF ¶¶ 81-84, 93-95, 111-14, 135.  The Court overrules each objection.  As regards statements by Town selectmen, the statements are not hearsay.  Under Federal Rule of Evidence 801(d)(2)(A), a statement offered against an opposing party and made by the party in a representative capacity is not hearsay.  FED. R. EVID. 801(d)(2)(A); *McDonough v. City of Quincy*, 452 F.3d 8, 21 (1st Cir. 2006) (statements by city officials involved in personnel management made within the scope of their employment are not hearsay).  Mr. Willinghan's statements about his medical condition at his job interview are not hearsay.  The Court received the statements not for their truth but to demonstrate that at the time of his job interview, the Town Selectmen asked him about his use of a cane and that he placed them on notice of his back condition before he was hired. PSAMF ¶¶ 81-82.

### 2.      Stonington Hires Mr. Willinghan

Stonington is located in Hancock County, Maine.  DSMF ¶ 1; PRDSMF ¶ 1. Howard S. Willinghan resides in Winter Harbor, Maine.  DSMF ¶ 2; PRDSMF ¶ 2. Stonington is governed by five selectpersons.   DSMF ¶ 3; PRDSMF ¶ 3.   In November 2006, Stonington hired Mr. Willinghan as Town Manager with a starting date of January 2, 2007.  DSMF ¶ 4; PRDSMF ¶ 4; PSAMF ¶ 80; DRPSAMF ¶ 80.

### 3.      The Employment Agreement

Mr. Willinghan executed a contract with the Town entitled "Town Manager's Employment Agreement" (Employment Agreement).   DSMF ¶ 5; PRDSMF ¶ 5. Section 3 of the Employment Agreement is titled "Conditions of Employment." DSMF ¶ 6; PRDSMF ¶ 6.

Among the conditions of employment in the Employment Agreement is that Mr. Willinghan's term of employment was "for a period of three years, running from January 1, 2007 through December 31, 2009."   DSMF ¶ 7; PRDSMF ¶ 7. Notwithstanding this anticipated term of employment, the Employment Agreement further provides for termination of Mr. Willinghan's employment by the Town before the expiration of his contractual term of employment:

> Nothing in this agreement shall prevent, limit, or otherwise interfere with the right of the Board of Selectmen to terminate the services of Employee with cause as provided for in M.R.S.A. 30A § 2633, subject to the provisions set forth in Section 4, paragraph (b) of this Agreement.

DSMF ¶ 8; PRDSMF ¶ 8.  The Employment Agreement also provides that Mr. Willinghan may voluntarily resign his own employment before the expiration of his employment term:

4

> Nothing in this agreement shall prevent, limit, or otherwise interfere with the right of Employee to resign at any time from this position with the Town, subject to the provisions set forth in Section 4, paragraph (b) of this Agreement.

DSMF ¶ 9; PRDSMF ¶ 9.   Section 4 of the Employment Agreement is entitled "Termination Conditions and Pay."  DSMF ¶ 10; PRDSMF ¶ 10.  Under Section 4(a) of the Employment Agreement:

> In the event Employee is terminated by the Board of Selectmen . . . while Employee is willing and able to perform the duties of Town Manager, Town shall continue to pay Employee's salary and benefits for a period of ninety (90) days following the specified date of termination, subject to [certain conditions irrelevant to this matter.]

DSMF ¶ 11; PRDSMF ¶ 11.  Section 4(b) of the Employment Agreement further provides, in relevant part, that Mr. Willinghan may:

> voluntarily resign the position of Town Manager at any time upon thirty (30) days written notice to the Town. In the event of such termination, Employee shall not be entitled to receive the termination pay provided for in paragraph (a) of this section.

DSMF ¶ 12; PRDSMF ¶ 12.

### 4.   Mr. Willinghan's Job Performance: January 2007 through July 2007

Mr. Willinghan received very positive feedback about his job performance and successfully completed his six-month probationary period.[5]   PSAMF ¶ 83;

---

[5] The Town denied Mr. Willinghan's statement of additional material fact paragraph 83 on the ground that his performance was deficient in many respects.   DRPSAMF ¶ 83.   To support paragraph 83, Mr. Willinghan refers to his own answers to interrogatories in which he states that after three months of employment, he requested a performance review and received favorable comments from the Board, that he continued to receive favorable comments through his six-month probationary period, that he successfully completed the six-month probationary period, and that in July 2007, the Board offered him a five-year contract, but that he opted for a three-year contract in hopes of receiving a substantial merit raise when the contract was renegotiated in three years. DSMF Attach. 4, *Pl.'s Resp. to Def.'s Interrogs.* ¶ 3.  Because the Court is required to view the facts in

DRPSAMF ¶ 83.   In July 2007, the Town offered Mr. Willinghan a five-year contract; Mr. Willinghan opted instead for a three-year contract because he hoped that his work bringing economic development to the Town would result in a substantial merit pay raise when the contract was renegotiated in three years.  *Id.* Based on the positive feedback he had received and the three-year contract he had been provided, Mr. Willinghan purchased a home in Stonington, and his wife and daughter moved from Maryland to Stonington; he intended to remain in the Town Manager position for at least seven years until he retired.[6]   PSAMF ¶ 84; DRPSAMF ¶ 84.

### 5.   Mr. Willinghan's Back Problems Flare Up

In August, 2007, Mr. Willinghan began to experience increased back pain and on August 27, 2007, he had his first appointment with Dr. Just, a board-certified anesthesiologist who specialized in pain medicine.[7]   PSAMF ¶ 85; DRPSAMF ¶ 85.

---

the light most favorable to Mr. Willinghan, the Court declines to accept the Town's denial and treats paragraph 83 as admitted for purposes of the pending motion.

[6] The Town denied Mr. Willinghan's statement of material fact paragraph 84 on the ground that his performance was deficient in many ways.  DRPSAMF ¶ 84.  For the same reasons set forth in footnote 5, the Court declines to accept the Town's denial and treats paragraph 84 as admitted for purposes of the pending motion.

[7] Although Mr. Willinghan states that his first appointment with Dr. Just was on August 27, 2007 and the Town admitted this assertion, PSAMF ¶ 85; DRPSAMF ¶ 85, Dr. Just's records state that his first visit with Mr. Willinghan took place on August 22, 2007.  PSAMF Attach. 3, *Peter W. Just, M.D. Medical Records Excerpts* at 1.  When questioned about this discrepancy at oral argument, the parties agreed that the August 22 date was inaccurate.  Based on the agreement of the parties, the Court accepts August 27, 2007 as the date of Mr. Willinghan's first visit with Dr. Just.

In the Town's paragraph 17, it asserts that Mr. Willinghan's physical problems increased before his November 2006 MRI.  DSMF ¶ 17.  Mr. Willinghan qualified his response, stating that he had reported to Dr. Just that his symptoms had increased over the six months before August 2007 and had really begun to bother him in August 2007.  PRDSMF ¶ 17.  The Court reviewed the Town's record citation to Mr. Willinghan's deposition.  DSMF ¶ 17 (citing Attach. 2, *Dep. of Howard S. Willinghan* 21:19-24 (*Willinghan Dep.*)).  In his response, Mr. Willinghan said only that he "may have" given that history to his doctors in Baltimore.  In view of Mr. Willinghan's less than

Mr. Willinghan's pain and "decline in walking tolerance" "started to really bother" him. DSMF ¶ 18; PRDSMF ¶ 18. Dr. Just's record of the August 27, 2007 initial appointment explains that he would make no recommendations about further treatment, including possible surgery, until after he had obtained a copy of a November 2006 MRI and Mr. Willinghan had undergone a new set of lumbar x-rays, and until they had a follow-up visit to discuss the information obtained.[8] PSAMF ¶ 86; DRPSAMF ¶ 86. At the August 27, 2007 office visit, Dr. Just did not suggest that any work accommodations were necessary.[9] DSMF ¶ 29; PRDSMF ¶ 29.

Although Mr. Willinghan's back and leg issues had become an acute issue in August 2007, Mr. Willinghan decided to attend the "Delmarva Motorcycle rally" that same month as part of a vacation scheduled for between September 10, 2007 and September 17, 2007.[10] DSMF ¶ 19; PRDSMF ¶ 19. During his vacation, Mr.

---

resounding confirmation of the history and the Court's obligation to view the evidence in the light most favorable to Mr. Willinghan, the Court has not included the Town's paragraph 17.

[8] The Town interposed a qualified response, noting that in his deposition, Dr. Just elaborated on his office notes, stating that he thought Mr. Willinghan had "segmental instability" and that, if he did, he "was going to need another operation . . . [that would not be a] routine stabilization." DRPSAMF ¶ 86. Dr. Just's testimony does not contradict the contents of paragraph 86 and the Court has accepted the paragraph without qualification.

[9] Mr. Willinghan interposed a qualified response. PRDSMF ¶ 29. However, the response explains why Dr. Just did not suggest work accommodations on August 27, 2007; it does not deny that Dr. Just did not make such suggestions on August 27, 2007. The Court includes the paragraph.

[10] The Town and Mr. Willinghan spar over the Town's paragraphs 26 and 27. DSMF ¶¶ 26-27; PRDSMF ¶¶ 26-27. The Town says that Mr. Willinghan decided not to alter his plans to attend the Delmarva festival despite his back problems. DSMF ¶¶ 26-27. Mr. Willinghan qualifies his response, arguing that the record citation does not support the assertion that he had been riding on motorcycles for years despite back problems, that Dr. Just would not have told Mr. Willinghan not to attend the festival, and that Mr. Willinghan's efforts to remain active were good for his health. PRDSMF ¶¶ 26-27. The Court is not clear about the relevance of this dispute. None of the statutes under which Mr. Willinghan is proceeding has a comparative negligence or assumption of the risk defense so it does not matter if Mr. Willinghan caused or aggravated his own back problems by rashly traveling long distances on a motorcycle. To the extent the Town is claiming that Mr.

Willinghan's motorcycle was his sole means of transportation.   DSMF ¶ 20; PRDSMF ¶ 20.  On this trip, Mr. Willinghan rode his motorcycle approximately 688 miles from Maine to Maryland.  DSMF ¶ 21; PRDSMF ¶ 21.  While in Maryland, Mr. Willinghan was in Baltimore "for a couple of days" during which he travelled approximately thirty to fifty miles a day on his motorcycle.  DSMF ¶ 22; PRDSMF ¶ 22.  Mr. Willinghan then travelled approximately 120 miles to Delmarva and attended the Delmarva festival from Friday through Sunday before riding his motorcycle back to Maine.  DSMF ¶¶ 23-24; PRDSMF ¶¶ 23-24.  Mr. Willinghan acknowledged that while riding his motorcycle, he was "not as comfortable as I wish I could be."[11]  DSMF ¶ 25; PRDSMF ¶ 25.

When Dr. Just saw Mr. Willinghan again on September 20, 2007, he diagnosed Mr. Willinghan with spinal instability, annular tear, severe degenerative disk disease, and canal stenosis.[12]  PSAMF ¶ 87; DRPSAMF ¶ 87.  Dr. Just did not

Willinghan's travel to Maryland in September 2007 is inconsistent with a bad back and perhaps the injury is factitious, this defense, if it is being pressed, has no record support.  In the context of a summary judgment motion, it is a non-starter.  The Court has not included paragraphs 26 and 27 since they are marginally—if at all—relevant and in any case, paragraph 19 covers the same ground.

In addition, the Court has not included paragraph 28 because it asserts that "following his vacation", Mr. Willinghan attended an August 27, 2007 office appointment with Dr. Just.  However, Mr. Willinghan's vacation was in September 2007.  DSMF ¶ 28.

[11] Mr. Willinghan interposed a qualified response to the Town's statement that he was not as comfortable as he wished he could be "under normal conditions."  PRDSMF ¶ 25.  Having reviewed the record citation, consisting of Mr. Willinghan's deposition, the Court concludes that although the Town's "even under normal circumstances" could be justified by the context of the testimony, as the Court is required to view the evidence in the light most favorable to the non-movant, the Court omitted the phrase.

[12] The Town interposed a qualified response, noting that at the September 20, 2007 appointment, Dr. Just had also "reiterated his earlier opinion that it was 'very likely' that Willinghan would require surgery."  DRPSAMF ¶ 87.  The Court declines to accept the Town's qualified response.  First, Dr. Just did not say in his August 2007 note that he thought it was "very likely" that Mr. Willinghan would require surgery.   To the contrary, Dr. Just's note states that he "will make no recommendations for a change in his treatment or additional treatment" until he had reviewed an old MRI and new lumbar x-rays.  Thus, on September 20, 2007, Dr. Just did not "reiterate" an

impose specific work restrictions on Mr. Willinghan on September 20, 2007.[13] DSMF ¶ 31; PRDSMF ¶ 31.

On September 24, 2007, Mr. Willinghan attended a Board meeting and informed the Board that he was having significant back problems and was seeing Dr. Just.[14]  DSMF ¶¶ 32-33; PRDSMF ¶¶ 32-33.[15]  At the time of the meeting, Mr. Willinghan understood that, although he had no right to medical leave, he was eligible for discretionary medical leave under the Town's personnel policy for up to sixty days without pay and also had a right to reasonable accommodation which may have included medical leave.[16]  DSMF ¶ 35; PRDSMF ¶ 35.[17]

"earlier opinion" about the need for surgery.  Second, Dr. Just's opinion about surgery on September 20, 2007 does not contradict paragraph 87 and the Court accepted the paragraph without qualification.  Similarly, consistent with this ruling, the Court eliminated the Town's assertion that on September 20, 2007 Dr. Just "reiterated" his view that Mr. Willinghan would require surgery. DSMF ¶ 30; PRDSMF ¶ 30.

[13] Mr. Willinghan interposed a qualified response to the original version of the Town's paragraph 31. The Court agrees that the paragraph, as drafted, overstates Dr. Just's view of restrictions as of September 20, 2007.  The Court's statement on Dr. Just's restrictions is consistent with the record.

[14] Mr. Willinghan interposed a qualified response to paragraph 33 on the ground that it said the September 24, 2007 Selectmen meeting was the first time he had informed the Board about his back problems.  PRDSMF ¶ 33.  The Court agrees with Mr. Willinghan and eliminated "first" from the Town's paragraph 33.

[15] The Court has not included the Town's paragraph 34 in which it asserts that Mr. Willinghan made no request for family medical leave at the September 24, 2007 Selectmen meeting.  DSMF ¶ 34.  Mr. Willinghan denied the assertion and cited Mr. Larrabee's deposition for support.  PRDSMF ¶ 34.  In Mr. Larrabee's deposition, he clearly confirms that Mr. Willinghan asked for family medical leave during the September 24, 2007 Selectmen meeting.  PRDSMF ¶ 34 (citing PSAMF Attach. 4, *Larrabee Dep.* 20:9-25).

[16] Here, consistent with its obligation to view the evidence in the light most favorable to the non-movant, the Court recited the Town's assertion in the first phrase and included Mr. Willinghan's response in the last two phrases.

[17] The Court has not included the Town's paragraph 36, which asserted that at the September 24, 2007 Board meeting, there was no mention at all of Mr. Willinghan potentially needing any accommodation regarding his back issues.  DSMF ¶ 36.  Mr. Willinghan denied the paragraph. PRDSMF ¶ 36.  He cited the portion of the Larrabee deposition set forth in footnote 15 in which Mr. Larrabee confirmed that Mr. Willinghan had requested family medical leave during that meeting, which could be construed as an accommodation.

On October 5, 2007, Mr. Willinghan notified the full Board of Selectmen in writing:

> I am receiving the first epidural shot Wednesday afternoon so I will have to take that afternoon off.  I should be well enough to come in on Thursday.  I have not been able to schedule an appointment with the orthopedist in Bangor yet; I have to get approval from my former employer for any additional procedures to be performed.

PSAMF ¶ 88; DRPSAMF ¶ 88.  Mr. Larrabee, one of the Town Selectmen, testified that he thought it was reasonable for Mr. Willinghan to wait to get approval before he saw an orthopedic surgeon so that he would not have to pay for it himself and that it would not be fair of the Board to expect him to provide documentation about his medical condition from a specialist he had not yet seen.[18]  *Id.*

On October 10, 2007, Mr. Willinghan underwent the first in a series of epidural treatments, but it failed to provide him with relief from his increased pain. PSAMF ¶ 89; DRPSAMF ¶ 89.  On or around October 13, 2007, Mr. Willinghan told Town Clerk Kathleen Billings-Pezaris about his worsened condition and discussed possible ways his disability could be accommodated.[19]  DSMF ¶ 37; PRDSMF ¶ 37; PSAMF ¶ 90; DRPSAMF ¶ 90.  Ms. Billings-Pezaris told Mr. Willinghan that she

---

[18] Mr. Willinghan's statement of material fact paragraph 88 asserts that it was "reasonable" for him to wait to get approval and that it would not be "fair" for the Board to expect him to provide documentation about his medical condition from a specialist he had not yet seen.  PSAMF ¶ 88.  The Town objected to the terms "reasonable" and "fair" as they imply value judgments and/or legal conclusions.  DRPSAMF ¶ 88.

In support of his paragraph, Mr. Willinghan cites the deposition of Mr. Larrabee and in those portions of the Larrabee deposition, Mr. Larrabee makes those statements.  PSAMF ¶ 88 (citing *Larrabee Dep.* 16:3-9, 19-24).  The Court agrees with Mr. Willinghan that Mr. Larrabee's testimony is admissible but also agrees with the Town that Mr. Larrabee's testimony reflects his opinions.  The Court has therefore altered Mr. Willinghan's paragraph 88 to reflect that the contents are Mr. Larrabee's opinions.

[19] The Town interposed a qualified response, noting that Mr. Willinghan's mid-October 2007 conversation with Ms. Pezaris was "off the cuff."  DRPSAMF ¶ 90.  The Court is not certain why an off-the-cuff statement merits a qualified response and the Court treats the paragraph as admitted.

could provide back-up for him if he needed additional assistance to accommodate his disability.[20]  PSAMF ¶ 91; DRPSAMF ¶ 91.

On October 14, 2007, Mr. Willinghan went to speak with Mr. Larrabee, the Chairman of the Board, about his back condition.  DSMF ¶ 38; PRDSMF ¶ 38; PSAMF ¶ 92; DRPSAMF ¶ 92.  Mr. Larrabee reassured Mr. Willinghan that a medical problem was something the Town could deal with.[21]  PSAMF ¶ 93; DRPSAMF ¶ 93.  Mr. Larrabee was very positive and supportive and made a statement to the effect of "Don't worry about anything, get yourself fixed up, we can work with this. . . ."  PSAMF ¶ 94; DRPSAMF ¶ 94.  Mr. Larrabee also discussed Mr. Willinghan's future with the Town and told him that he was pleased with his performance and there was no reason why accommodation could not be made for his disability.  PSAMF ¶ 95; DRPSAMF ¶ 95.  Mr. Willinghan did not provide the Town with medical documentation; neither Mr. Larrabee nor any Town official ever asked

---

[20] The Town objected to Ms. Billings-Pezaris' statement on the ground that it is hearsay.  DRPSAMF ¶ 91.  The Court overrules this objection.  First, the statement is not received for its truth.  Second, Ms. Billings-Pezaris' statement goes directly to the reasonableness of any accommodation.  Third, it is admissible under Rule 801(d)(1)(B) because it is consistent with Mr. Willinghan's, not the Town's, version of the events.  FED. R. EVID. 801(d)(1)(B).  Mr. Willinghan says that he proposed to the Town that the Town Clerk could temporarily fill in for him, PSAMF ¶ 102; the Town denies that Mr. Willinghan ever made that offer.  DRPSAMF ¶ 102.  Ms. Billings-Pezaris' offer to act in his stead tends to corroborate Mr. Willinghan's version and the reasonableness of his suggested accommodation.

[21] In addition to its hearsay objections, the Town interposed qualified responses to paragraphs 93, 94, and 95, noting that it is undisputed that Mr. Willinghan never provided the Town with any medical records regarding the medical condition that led to his resignation.  DRPSAMF ¶¶ 93-95.  The Town's qualified responses do not logically follow from Mr. Willinghan's assertion that Mr. Larrabee told him that a medical problem is something the Town could deal with and that he should not worry.  The Court declines to accept the Town's qualified responses and deems the statements admitted.

Regarding paragraph 95, the Town reiterates that Mr. Willinghan's performance was deficient in many ways.  DRPSAMF ¶ 95.  The Court addressed this objection in footnote 5.

Mr. Willinghan to provide any medical documentation.[22]   DSMF ¶ 39; PRDSMF ¶ 39; PSAMF ¶ 136; DRPSAMF ¶ 136.

### 6.   The October 15, 2007 Board Meeting

Mr. Willinghan attended the weekly Board meeting on October 15, 2007 and informed the rest of the Board of his condition and the possibility that he might need surgery.[23]   DSMF ¶ 40; PRDSMF ¶ 40; PSAMF ¶ 96; DRPSAMF ¶ 96.   Mr. Willinghan understood that he was eligible for discretionary medical leave under the Town's personnel policy provision for leaves of absence without pay for up to sixty days under Article XII(B).[24]   PSAMF ¶ 97; DRPSAMF ¶ 97.   At that meeting, Mr. Willinghan requested that the Board go into executive session.   DSMF ¶ 41; PRDSMF ¶ 41.   During the executive session, Mr. Willinghan requested that the Board afford him medical leave as one alternative for his back condition.[25]   DSMF ¶ 42; PRDSMF ¶ 42.   When the Board asked how long a leave would be required, Mr. Willinghan responded that he did not know.   DSMF ¶ 43; PRDSMF ¶ 43.   Mr.

---

[22] The Town denied this paragraph, asserting that in fact Mr. Larrabee had asked for such documentation.   DRPSAMF ¶ 135.   As the Court is required to view the evidence in the light most favorable to the non-movant, the Court accepts the paragraph.

[23] The Town interposed a qualified response to this paragraph, adding detail to the conversation between Mr. Willinghan and the Board.   DRPSAMF ¶ 96.   However, in the Town's recitation it admitted that Mr. Willinghan informed the Board about his back condition and that he might have surgery.   *Id.*   Accordingly, the Court treats the paragraph as admitted.

[24] The Town objected to paragraph 97 on the ground that the statements were legal conclusions and on the ground that Mr. Willinghan understood he had no right to family medical leave.   DRPSAMF ¶ 97.   The Court overrules the Town's objections.   First, the statement is framed as Mr. Willinghan's understanding, not as a legal proposition.   Second, Mr. Willinghan does not assert in the statement that he had a right to family medical leave; in fact, he says that he understood the leave was discretionary.

[25] The Town's paragraph 42 did not note that this request was one alternative.   DSMF ¶ 42.   Mr. Willinghan interposed a qualified response, stating that the request was one alternative possibility.   PRDSMF ¶ 42.   The Court includes Mr. Willinghan's additional language.

Willinghan further told the Board that he would probably require back surgery. DSMF ¶ 44; PRDSMF ¶ 44.  Mr. Willinghan said that if he underwent surgery, he did not know how long the surgery would keep him from working.  DSMF ¶45; PRDSMF ¶ 45.

At the meeting, Mr. Willinghan proposed at least two accommodations,[26] which he believed were reasonable, that would allow him to perform the duties of his position despite his disability.[27]   DSMF ¶ 46; PRDSMF ¶ 46; PSAMF ¶ 98; DRPSAMF ¶ 98.  These possible accommodations included working from home part-time with scheduled office hours and appointments in the Town Office, or, in the alternative, taking an unpaid leave while undergoing a series of epidural treatments.  PSAMF ¶ 99; DRPSAMF ¶ 99.

Mr. Willinghan's first suggested accommodation was to work from home and come to the Town Office for scheduled office hours and appointments.[28]  DSMF ¶ 47;

---

[26] Mr. Willinghan interposed a qualified response, indicating that he offered more than two possible accommodations.  PRDSMF ¶ 46.  The Court amended paragraph 46 to reflect that he offered "at least" two possible accommodations.

[27] Mr. Willinghan's original paragraph asserted that his proposed accommodations were in fact "reasonable."  PSAMF ¶ 98.  The Court altered the assertion to make it clear that Mr. Willinghan thought the proposed accommodations were reasonable.  Whether they were in fact reasonable is a question of law.

The Town interposed a qualified objection to paragraphs 98, 99, 100, 101, 102 and 103 of the Plaintiff's statement of additional material fact, asserting that Mr. Willinghan made two specific suggestions for accommodation.  DRPSAMF ¶¶ 98-103.  The Town says that Mr. Willinghan proposed to work from home with irregular hours at the Town Office and to come to the Town Office for scheduled office hours and appointments and that he proposed to take an unpaid leave of absence until he found out exactly what the situation would be.  *Id.*  As the Court is required to view the evidence in the light most favorable to Mr. Willinghan, the Court has accepted his version for purposes of this motion.

[28] The Town's original paragraph asserted that Mr. Willinghan suggested that he work at home at irregular hours, including "two o'clock in the morning," and come into the Town Office for scheduled office hours and appointments.  DSMF ¶ 47.  Mr. Willinghan interposed a qualified response, noting that he had suggested restricted office hours, making appointments to see people, and doing most of the work at home.  PRDSMF ¶ 47.  In response to a question, Mr. Willinghan explained that one

13

PRDSMF ¶ 47.  Mr. Willinghan further explained his suggestion of a restructured work schedule to the Board on October 15, 2007, including the possibility of "restricted hours in the office, asked them whether I could make appointments to see people, do most of my work at home or part of my work at home."  PSAMF ¶ 100; DRPSAMF ¶ 100.  He also explained some possible advantages of "work from home as opposed to work in the office," including:

> literally if I couldn't sleep at two o'clock in the morning I could do town work, but if I had to lay down or had to relax or something in any way, I could take a 20 minute break or like that, get myself back into shape and recharge my batteries a little bit and go back to working.  As I said, if someone needed me, I was less than a mile from the town hall. I could be in there at any time.  I got a complete office in my house.

*Id.*  He expected as part of what he believed was a reasonable accommodation that he would be "working at 2 a.m. and laying down during the day" only "sporadically."[29]  *Id.*  Frequent changes in body position reduced Mr. Willinghan's pain and made him feel better.  *Id.*  He explained that it would be a lot easier for him to change his body position frequently when not in a public situation.[30]  *Id.*

---

advantage to working at home would be that if he could not sleep at two o'clock in the morning, he could do Town work.  *Id.*  The Court agrees with Mr. Willinghan that the Town's reference to his offer to work at two o'clock in the morning mischaracterizes his suggested accommodation and the Court declines to include it in the statement of facts.

[29] Mr. Willinghan's original paragraph asserted that his proposed accommodations were in fact "reasonable."  PSAMF ¶ 100.  The Court altered the assertion to make it clear that Mr. Willinghan believed the proposed accommodations were reasonable, but whether they were in fact reasonable is a question of law.

[30] Mr. Willinghan's original paragraph stated this proposition as a fact, not his explanation to the Board.  PSAMF ¶ 100.  The Court altered the assertion to make it clear that Mr. Willinghan explained this proposition to the Board.

A second suggested accommodation was to take an unpaid leave of absence "until we found out exactly what the situation would be."[31]   DSMF ¶ 48; PRDSMF ¶ 48.[32]  Mr. Willinghan's accommodation suggestion was that he take unpaid leave while undergoing a series of epidural treatments, and he explained to the Board that after his next appointment with his doctor on October 24, 2007, he should be able to give them additional information concerning what accommodation and medical procedures might be required.   PSAMF ¶ 101; DRPSAMF ¶ 101.   Mr. Willinghan further suggested that then Town Clerk Billings-Pezaris could do his job during his absence and that she was qualified to do so.   PSAMF ¶ 102; DRPSAMF ¶ 102.   Ms. Billings-Pezaris took over as Town Manager right after Mr. Willinghan resigned on October 23, 2007 and she remains the Town Manager.   *Id.*  She had previously served as acting Town Manager for about three months in early 2000 while continuing to serve as full-time Town Clerk.   *Id.*

On October 15, 2007, Mr. Willinghan also offered to provide his medical records to the Board and received no response; on October 22, 2007, he offered to provide the Town medical records from Dr. Just by picking them up at his

---

[31] Mr. Willinghan interposed a qualified response to the Town's paragraph that stated only that he suggested an unpaid leave of absence "until we found out exactly what the situation would be." DSMF ¶ 48.  Mr. Willinghan points out that he had an appointment with Dr. Just to begin epidural treatments on October 24, 2007.  PRDSMF ¶ 48.  The Court agrees with Mr. Willinghan that the length of the anticipated leave was not quite as open-ended as the Town's paragraph 48 implies.  The Court incorporates in its recitation Mr. Willinghan's qualification and statement of additional fact paragraph 101 about the epidural treatments.  *See* DSMF ¶ 52; PRDSMF ¶ 52.

[32] Mr. Willinghan denied the Town's paragraphs 49 and 50 and, in accordance with its obligation to view the evidence in the light most favorable to the non-movant, the Court has not included them. DSMF ¶¶ 49-50; PRDSMF ¶¶ 49-50.

appointment on Wednesday, October 24, 2007.[33]  PSAMF ¶ 136; DRPSAMF ¶ 136. Although Mr. Willinghan offered to obtain medical documentation of his need for a reasonable accommodation for his disability, no employee, agent or representative of the Town ever responded to his offer before the Board requested his resignation. PSAMF ¶ 137; DRPSAMF ¶137.  The Board found Mr. Willinghan to be honest and believed his oral reports about his medical situation.[34]  PSAMF ¶ 138; DRPSAMF ¶ 138.  No employee, agent or representative of the Town ever requested that Mr. Willinghan provide medical documentation before the Board requested his resignation.[35]  DSMF ¶ 51; PRDSMF ¶ 51; PSAMF ¶ 138; DRPSAMF ¶ 138.  Mr. Willinghan did not present the Board with any doctors' notes or other medical records on or before October 15, 2007.  DSMF ¶ 51; PRDSMF ¶ 51.

Despite Mr. Willinghan's request to discuss his potential needed accommodation as Town Manager, there was no response from the Board concerning any possible accommodation.  PSAMF ¶ 103; DRPSAMF ¶ 103.  Mr. Willinghan suggested that the Board research the Americans with Disabilities Act and refrain from taking any further official position until the next weekly meeting.

---

[33] The Town interposed qualified responses, stating that it is "undisputed that at no point either before or after his resignation did Mr. Willinghan provide medical records of any kind to the Town regarding the medical condition that led to his resignation."  DRPSAMF ¶¶ 136-37.  The Town's responses are non-responsive.  In paragraph 136, Mr. Willinghan does not contend that he actually supplied the records to the Town; he only says that he offered to do so, and in paragraph 137, he does not contend that he gave the records to the Town, he only says that the Town never responded to his offer to obtain the records.  The Court accepts paragraphs 136 and 137.

[34] The Town denied this paragraph but the denial goes to the next sentence.  DRPSAMF ¶ 138.  The Court accepts the first sentence as not objected to and therefore admitted.

[35] The Town denied this statement, asserting that Mr. Larrabee had requested such documentation. DRPSAMF ¶ 138.  As the Court is required to view the evidence in the light most favorable to the non-movant, the Court accepts the Plaintiff's statement.

PSAMF ¶ 104; DRPSAMF ¶ 104.  At the October 15, 2007 meeting, the Board did not discuss or comment on Mr. Willinghan's suggested accommodations.  PSAMF ¶ 105; DRPSAMF ¶ 105.  The Board understood that Mr. Willinghan did not qualify for medical leave under the federal and state family leave acts and thus that under the law, they did not have to give Mr. Willinghan medical leave.  *Id.*  The Board did not indicate that his suggested accommodations would in any way be a hardship.[36] PSAMF ¶ 106; DRPSAMF ¶ 106.  The Board also did not suggest any other possible accommodations that would be acceptable to it or in any way engage Mr. Willinghan in a dialogue about possible reasonable accommodations.[37]  PSAMF ¶ 107; DRPSAMF ¶ 107.

At the October 15, 2007 meeting, the Board of Selectmen appointed then Town Clerk, Ms. Billings-Pezaris, as Assistant Town Manager, a position that had not previously existed.[38]  PSAMF ¶ 108; DRPSAMF ¶ 108.  This promotion was

---

[36] The Town denied this paragraph, observing that Mr. Willinghan's suggested accommodation would have been a hardship on the Town.  DRPSAMF ¶ 106.  The Town's denial is not responsive to the paragraph.  Mr. Willinghan's paragraph asserted that the Board did not indicate that his suggested accommodation would be a hardship, not whether it would in fact have been a hardship.  In any event, as the Court is required to view the evidence in the light most favorable to the non-movant, the Court accepts Mr. Willinghan's assertion.

[37] The Town interposed a qualified response, observing that Mr. Willinghan had not presented the Board with any doctors' notes or other medical records.  DRPSAMF ¶ 107.  Again, the Town's response is non-responsive to the paragraph.  The statement simply asserts that the Board did not suggest accommodations or engage in a dialogue with Mr. Willinghan about possible accommodations.  It does not make assertions about why the Board did not do so.  As the Court is required to view the evidence in the light most favorable to the non-movant, the Court accepts Mr. Willinghan's assertion.

The Court altered the assertion to strike "good faith" as a modifier for dialogue.  The point is that the Town did not engage in any dialogue at all.  The Plaintiff's use of the modifier infuses a conclusion of law into an assertion of fact.  *See Phelps v. Optima Health, Inc.*, 251 F.3d 21, 27-28 (1st Cir. 2001) (discussing employer's obligation to undertake an informal interactive process in good faith).

[38] The Town interposed qualified responses to paragraphs 108, 109, and 110, noting that at the October 15, 2007 meeting, the Board approved Ms. Billings-Pezaris as Assistant Town Manager

voted on, passed, and signed without any previous notice to Mr. Willinghan, who was then Town Manager and had sole responsibility under the Town Charter for all employee matters.    PSAMF ¶ 109; DRPSAMF ¶ 109.    At the meeting, Mr. Willinghan did not object to the Board naming Ms. Billings-Pezaris as Assistant Town Manager.[39]  DSMF ¶ 53; PRDSMF ¶ 53.  Mr. Willinghan was not given any opportunity to provide any input before this employment decision.  PSAMF ¶ 110; DRPSAMF ¶ 110.

### 7.    The Board Seeks Maine Municipal Association Advice and Maine Municipal Association Responds

On October 16, 2007, the day after Mr. Willinghan revealed his worsened condition to the Board of Selectmen and requested reasonable accommodations for his disability, Selectman Evelyn Duncan came into the Town Office and used a phone within obvious earshot of Mr. Willinghan to call the Maine Municipal Association.[40]  PSAMF ¶ 111; DRPSAMF ¶ 111.  During the call, Selectman Duncan

---

without objection from Mr. Willinghan.  DRPSAMF ¶¶ 108-10.  The Town's qualified responses are non-responsive.  The Court deems paragraphs 108-10 admitted without qualification.

[39] Mr. Willinghan denied this paragraph and for support cited his deposition.  PRDSMF ¶ 53.  The Court reviewed the portion of the deposition transcript Mr. Willinghan cited and found:

> Q.  Now, at the October 15th meeting, Miss Pezaris was appointed to be the assistant town manager?
>
> A.  Yes.
>
> Q.  Did you object to that?
>
> A.  No.

*Dep. of Howard S. Willinghan* 47:4-8.  It is true that Mr. Willinghan went on to say that, even though he did not object, he thought the appointment of Ms. Billings-Pezaris was objectionable.  *Id.* 47:9-20.  However, Mr. Willinghan confirmed at his deposition that he did not object at the October 15, 2007 Board meeting.  The Court will not accept his denial.

[40] In addition to its hearsay objection, *see* footnote 4, the Town objects on the ground that the assertions in paragraphs 111, 112, 113, and 114 are not supported by Mr. Willinghan's record support.  DRPSAMF ¶¶ 111-14.  In support of his assertion, Mr. Willinghan cited his answer to

discussed ways that Mr. Willinghan's employment could be terminated.  PSAMF ¶ 112; DRPSAMF ¶ 112.  This conversation was conducted where Mr. Willinghan could obviously hear the conversation about his employment being terminated.  PSAMF ¶ 113; DRPSAMF ¶ 113.  Selectman Duncan never mentioned during this conversation with the Maine Municipal Association that Mr. Willinghan had a medical disability and had requested a reasonable accommodation the previous day.  PSAMF ¶ 114; DRPSAMF ¶ 114.

On October 17, 2007, the Maine Municipal Association sent written advice to Selectman Duncan, explaining that Mr. Willinghan may have a legal right to a medical leave of absence or other reasonable accommodation under the Maine Human Rights Act, the Americans with Disabilities Act, and the Town's own personnel policies.[41]  PSAMF ¶ 115; DRPSAMF ¶ 115.  This written advice was provided to all of the Board members by about October 18, 2007.  *Id.*

---

interrogatories in which he set forth his recollection of the event.  The Court reviewed the cited interrogatory answer and it tracks the assertion in the paragraphs.  PSAMF ¶¶ 111-14 (citing *Pl.'s Resp. to Def.'s Interrogs.* ¶ 3(41)).  The Town cites Selectman Duncan's deposition testimony, which it says does not support Mr. Willinghan's assertion.  DRPSAMF ¶¶ 111-14 (citing DRPSAMF Attach. 2 *Excerpts Evelyn Duncan Dep.* 46:6-48:24, 81:1-103:25).  As regards paragraph 111, the Court reviewed the cited portion of Selectman Duncan's deposition transcript and, contrary to the Town's position, Selectman Duncan admits that she called the Maine Municipal Association on behalf of the Board of Selectman to ask about Mr. Willinghan's disability.   From the Court's review of the cited portions of the Duncan deposition transcript, Selectman Duncan does not corroborate all of the assertions in Plaintiff's paragraphs 112 through 114; however,  the Court is required to view the evidence in the light most favorable to the non-movant.  The Court refuses to accept the Town's denial and deems the paragraph admitted.

[41] The Town denied this paragraph, asserting that the referenced document "merely provides general guidance regarding the Maine Human Rights Act and Americans with Disabilities Act and does not specifically reference the Plaintiff in any way, much less whether the Plaintiff, under all the facts in this case, has a 'right' to medical leave or any other accommodation."  DRPSAMF ¶ 115.  The Court reviewed the cited email from Maine Municipal Association Staff Attorney Susanne F. Pilgrim to Selectman Duncan dated October 17, 2007.  PSAMF Attach. 9, *email from Legal Services Dep't dated Oct. 17, 2007*.  The Court disagrees with the Town's characterization.  Attorney Pilgrim states:

Based on what we discussed, I do think a disability under Maine law is involved.

### 8.   Mr. Willinghan Requests Accommodation

On October 18, 2007, Mr. Willinghan's doctor told him that he was at risk for catastrophic failure of his spine unless his work conditions were modified.[42] PSAMF ¶ 116; DRPSAMF ¶ 116.   Mr. Willinghan's doctor agreed that the accommodations he had proposed to the Board of Selectmen would be appropriate modifications of his working conditions.[43]   PSAMF ¶ 117; DRPSAMF ¶ 117.[44]   On

Attorney Pilgrim observes that "it sounds like you have only preliminary information and do not actually have a doctors' note or anything concrete concerning the condition involved or whether surgery, leave, etc. will actually be required." She urges the Town to "get more information before making any decisions." She then mentions the Town's potential obligations for reasonable accommodation under the ADA and the MHRA and its potential responsibilities under its personnel policy for leaves of absence. Viewing paragraph 115 in the light most favorable to the non-movant, Attorney Pilgrim's letter fully supports the assertions in the paragraph. The Court treats the paragraph as admitted.

[42] The Town objects to this paragraph on the ground that it is based on inadmissible hearsay. DRPSAMF ¶ 116. The Court does not view the doctor's statement as offered for its truth but instead to confirm Mr. Willinghan's understanding of his back condition and the need for accommodation. The Court overrules the Town's objection. The Town next interposed a qualified response, noting that Dr. Just "never suggested any particular accommodation" and that Mr. Willinghan had not provided any medical records. *Id.* The Town's qualified response is not responsive to the paragraph. Mr. Willinghan is not asserting that the doctor imposed specific restrictions or that he provided medical records to the Town. The Court deems the paragraph admitted.

[43] In paragraph 54, the Town asserted that on October 18, 2007, Dr. Just recommended to Mr. Willinghan that he discontinue work altogether. DSMF ¶ 54. Mr. Willinghan interposed a qualified response, noting that Dr. Just had told Mr. Willinghan that he could continue working a sedentary job if he was careful. PRDSMF ¶ 54. The Court agrees with the Town that Dr. Just testified that he recommended Mr. Willinghan cease working but also agrees with Mr. Willinghan that Dr. Just later clarified that he thought Mr. Willinghan could continue working in a sedentary job if he was careful. The Court has not included the Town's paragraph 54 since it is obligated to view conflicting evidence in the light most favorable to the non-movant.

For similar reasons the Court declines to accept the Town's paragraph 55. DSMF ¶ 55; PRDSMF ¶ 55.

[44] The Town objects to paragraph 117 on the ground that it is based on inadmissible hearsay. DRPSAMF ¶ 117. The Court does not view the doctor's statement as offered for the truth but to reflect Mr. Willinghan's understanding of his back condition and the need for accommodation. The Court overrules the Town's objection. The Town next interposed a qualified response, noting that Dr. Just "never suggested any particular accommodation that might permit Willinghan to continue his work as a Town Manager." *Id.* Mr. Willinghan's paragraph 117 and his record citation suggest otherwise. As the Court is required to view the evidence in the light most favorable to the non-movant, the Court accepts the assertions in the paragraph. As regards the Town's contention that Mr. Willinghan never supplied any medical records to the Town, paragraph 117 does not contend that Mr. Willinghan did supply medical records to the Town. The Court accepts paragraph 117.

20

October 18, 2007, Dr. Just did not provide Mr. Willinghan with a note regarding his work restrictions.  DSMF ¶ 56; PRDSMF ¶ 56.  Although on October 18, 2007, Dr. Just did not tell Mr. Willinghan how long he was going to need to miss work, he was optimistic that the second injection, scheduled for October 24, would be more effective than the first injection on October 10.[45]  DSMF ¶ 38; PRDSMF ¶ 58.

On October 22, 2007, Mr. Willinghan again went before the Board, told them that because of his very serious back condition he required modifications in his work conditions, and requested that they discuss possible accommodations for his disability.[46]  DSMF ¶ 59; PRDSMF ¶ 59; DSMF ¶ 61; PRDSMF ¶ 61; PSAMF ¶ 118; DRPSAMF ¶ 118.  Mr. Willinghan had not discussed his medical issues with the Board, or any Board members, between the October 15, 2007 and the October 22, 2007 Board meetings.  DSMF ¶ 60; PRDSMF ¶ 60.  Mr. Willinghan advised the Selectmen that he was able to continue the assigned duties of his position with accommodation.[47]    PSAMF ¶119; DRPSAMF ¶ 119.    Mr. Willinghan again

---

[45] The Court melded the Town's paragraph 58 with salient portions of Mr. Willinghan's response to paragraph 58.  DSMF ¶ 58; PRDSMF ¶ 58.

[46] The Town interposed a qualified response, contending that Mr. Willinghan told the Board that he had catastrophic failure in his back and that he could not continue to work under his current conditions, that Dr. Just never suggested any particular accommodations, and that Mr. Willinghan never provided any medical records to the Town.  DRPSAMF ¶ 118.  As regards the first point, as Mr. Willinghan's version of the October 22, 2007 meeting conflicts with the Town's, the Court is required to accept the non-movant's version and does so.  As regards the Town's contentions about Dr. Just's lack of specificity and the absence of medical records, the paragraph does not contend that Mr. Willinghan made specific suggestions concerning work conditions or that he supplied the Town with medical records.  The Court deems the paragraph admitted.

[47] The Town interposed a qualified response, pointing out that Dr. Just never suggested any specific accommodations and that Mr. Willinghan never provided the Town with any medical records.  DRPSAMF ¶ 119.  As regards the Town's contentions about Dr. Just's lack of specificity and the absence of medical records, the paragraph does not contend that Mr. Willinghan made specific suggestions concerning work conditions or that he supplied the Town with medical records.  The Court deems the paragraph admitted.

suggested several accommodations.[48]   PSAMF ¶ 120; DRPSAMF ¶ 120.   He requested four to six weeks of unpaid medical leave.[49]   PSAMF ¶ 121; DRPSMF ¶ 121.   The Board knew that Mr. Willinghan preferred a medical leave over having his employment end.   PSAMF ¶ 122; DRPSAMF ¶ 122.   Mr. Willinghan also requested that the Board of Selectmen wait two days until he had a second epidural treatment on October 24, 2007 before making any decision about his employment.[50] PSAMF ¶ 123; DRPSAMF ¶ 123.   The Selectmen did not suggest any alternative to Mr. Willinghan's proposal to have the Town Clerk fill in for him while he was on medical leave.[51]   PSAMF ¶ 124; DRPSAMF 124.

At the meeting, Mr. Willinghan told the Board that he "understood with my contract I worked at their discretion."   DSMF ¶ 62; PRDSMF ¶ 62.   In response, the Board expressed its opinion that the Town "needed somebody at the helm."   DSMF

---

[48] The Town interposed a qualified response, asserting facts about the accommodations Mr. Willinghan suggested.   DRPSAMF ¶ 120.   The Town's response is non-responsive.   Mr. Willinghan's paragraph 120 does not assert what accommodations he suggested.   The Court deems the paragraph admitted.

[49] The Town interposed a qualified response, asserting that Mr. Willinghan made two accommodation requests: (1) to be allowed to work at home and keep irregular hours; and (2) for an unpaid leave of absence until the situation was clarified.   DRPSAMF ¶ 121.   The Court is required to view the evidence in the light most favorable to the non-movant and therefore accepts paragraph 121.

[50] The Town interposed qualified responses to paragraphs 122 and 123, asserting that Mr. Willinghan was aware when he resigned that the Employment Agreement provided a procedure by which the Board could terminate his employment, that nothing in the Employment Agreement required Mr. Willinghan to resign upon the Board's request, and that he understood there was a difference between resignation and termination under the Employment Agreement.   DRPSAMF ¶¶ 122-23.   The Town's qualified response is not responsive to these paragraphs.   Mr. Willinghan is not asserting anything about what he knew or the Employment Agreement provided; he is making assertions about what the Board of Selectmen knew and what he asked it to do.   The Court treats the paragraph as admitted.

[51] The Town interposed a qualified response, noting that Mr. Willinghan never provided the Town with medical records.   DRPSAMF ¶ 124.   Paragraph 124 does not assert that Mr. Willinghan provided the Town with medical records.   The Court deems the paragraph admitted.

¶ 63; PRDSMF ¶ 63.  In further response, the Board stated that the issue regarding Mr. Willinghan's proposed accommodations was a personnel issue that needed to be discussed in an executive session.  DSMF ¶ 64; PRDSMF ¶ 64.[52]

### 9.   The Board of Selectmen Votes and Mr. Willinghan Resigns

In response to Mr. Willinghan's second request for reasonable accommodation, the Board of Selectmen went into executive session.[53]  PSAMF ¶ 125; DRPSAMF ¶ 125.  The Board invited Mr. Willinghan to attend the executive session to discuss the matter further, but he declined the invitation.  DSMF ¶ 65; PRDSMF ¶ 65.  Before commencing the executive session, the Board of Selectmen asked everyone to leave and Mr. Willinghan left as requested.[54]  PSAMF ¶ 126; DRPSAMF ¶ 126.  The Board then went into executive session.  DSMF ¶ 66; PRDSMF ¶ 66.

After the executive session, the five Selectmen unanimously made a formal motion to request Mr. Willinghan's resignation "as he informed the Board he is unable to perform his duties."  PSAMF ¶ 127; DRPSAMF ¶ 127.  Shortly thereafter,

---

[52] In the Town's paragraph 63, it asserted that after Mr. Willinghan acknowledged that he worked at the Selectmen's discretion, the Board expressed its opinion on the hardship to the Town and that the Town "needed someone at the helm."  DSMF ¶ 63.  Mr. Willinghan interposed a qualified response, contending that the Town's citation did not support its assertion.  PRDSMF ¶ 63.  The Court has included as paragraph 63 the portion of the statement that Mr. Willinghan concedes is correct.

[53] The Town interposed a qualified response, setting forth its version of the meeting.  DRPSAMF ¶ 126.  Having reviewed the Town's view of the sequencing of events at the meeting, the Court finds that Mr. Willinghan's paragraph 125 does not differ in its essence with the Town's response.  The Court deems paragraph 125 admitted.

[54] The Town did not admit, deny or qualify its response to paragraph 126.  DRPSAMF ¶ 126.  However, it offered its different version of the events leading to the executive session.  *Id.*  As the Court is required to view the evidence in the light most favorable to the non-movant, the Court accepts Mr. Willinghan's version.

Mr. Willinghan received a call from Selectman Larrabee stating that the Board had voted to request his resignation. DSMF ¶ 67; PRDSMF ¶ 67. Mr. Willinghan responded that he would submit his resignation the following day. DSMF ¶ 68; PRDSMF ¶ 68. By letter dated October 23, 2007, Mr. Willinghan formally resigned as Town Manager. DSMF ¶ 69; PRDSMF ¶ 69. In the letter, Mr. Willinghan wrote:

> It is with the utmost regret that based on my present physical condition, the advice of medical advisors, my obligation to the Town of Stonington and at the request of the Select Committee, that I tender my resignation as Town Manager, effective immediately.

DSMF ¶ 70; PRDSMF ¶ 70. Mr. Willinghan was aware at the time of his resignation that the Employment Agreement provided a procedure by which the Board could terminate his employment.[55] DSMF ¶ 71; PRDSMF ¶ 71. He was also aware that there is a difference between resignation and termination under the Employment Agreement and he interpreted the Board's action as a termination.[56] DSMF ¶ 73; PRDSMF ¶ 73.

As Stonington's current Town Manager has acknowledged, it would be hard for a town manager to continue to function if all five Selectmen passed a motion requesting his resignation and all town managers know that you should resign if

---

[55] In paragraph 72, the Town asserted that nothing in the Employment Agreement required Mr. Willinghan to resign upon the Board's request. DSMF ¶ 72. Mr. Willinghan denied this paragraph, asserting that there was an implied condition of his employment agreement that he resign if requested to do so by the Board. PRDSMF ¶ 72. As this is a contested factual issue and as the Court is required to view the facts in the light most favorable to the non-movant, the Court has not included paragraph 72 in its statement of facts.

[56] The Court melded the Town's paragraph 73 and Mr. Willinghan's qualified response. DSMF ¶ 73; PRDSMF ¶ 73.

requested to do so by the Selectmen.[57]   PSAMF ¶ 128; DRPSAMF ¶ 128.   Mr. Willinghan protested the request for his resignation but, aware that the Selectmen were considering termination, he agreed to submit a letter of resignation the next day in response to the Board's demands.[58]   PSAMF ¶ 129; DRPSAMF ¶ 129.   The Board of Selectmen never entered into any dialogue with Mr. Willinghan about possible accommodations for his disability before demanding his resignation and never indicated to him that any of the accommodations he suggested would cause an undue hardship to the Town.[59]   PSAMF ¶ 139; DRPSAMF ¶ 139.

### 10.   Post-Resignation Events

The day after his resignation Mr. Willinghan underwent a successful epidural treatment which relieved his increased back pain and eliminated any immediate need for reasonable accommodation.[60]   PSAMF ¶ 130; DRPSAMF ¶ 130.

---

[57] The Town interposed a qualified response, noting that Mr. Willinghan was aware when he resigned the Employment Agreement provided a procedure for termination, that the Employment Agreement did not require Mr. Willinghan to resign, and that he understood the difference between a resignation and a termination under the Employment Agreement.   DRPSAMF ¶ 128.   Be all of this as it may, the Town's responses do not address the contents of the paragraph.   The Court accepts paragraph 128.

[58] The Town denied this paragraph.   DRPSAMF ¶ 129.   However, the paragraph is supported by the record reference and thus in accordance with the Court's obligation to view the facts in the light most favorable to the non-movant, the Court accepts it.

[59] The Town interposed a qualified response, noting that Mr. Willinghan had not provided any medical documentation to the Town and that Board members expressed their opinion on the hardship to the Town that would be caused by not having the Town Manager work primarily in the Town Hall and the Town "needed someone at the helm."   DRPSAMF ¶ 139.   As the Court is required to view the evidence in the light most favorable to the non-movant, the Court accepts paragraph 139.

[60] The Town objected to this statement as expert testimony.   DRPSAMF ¶ 130.   The Court disagrees. Mr. Willinghan knows what procedure he underwent, how it made him feel, and whether he felt capable of returning to his Town Manager duties without accommodation.   This is proper lay testimony.   Further, the Town denied the paragraph.   *Id.*   The Town first denied that Mr. Willinghan was forced to resign and the Court has eliminated "forced" from the statement.   The Town also adds the same statements that are reflected in footnotes 49, 54, and 56.   As the Court is required to view the facts in the light most favorable to the non-movant, the Court accepts the paragraph.

On October 29, 2007 at the first weekly meeting of the Board of Selectmen after Mr. Willinghan's resignation, the Board appointed Ms. Billings-Pezaris to the position of Permanent Town Manager.  PSAMF ¶ 131; DRPSAMF ¶ 131.  The Board did not take any steps to seek external candidates for the position before appointing Ms. Billings-Pezaris to the Town Manager position.  PSAMF ¶ 132; DRPSAMF ¶ 132. The Town represented in writing to the Maine Human Rights Commission that Ms. Billings-Pezaris was not hired as Permanent Town Manager on October 29, 2007. PSAMF ¶ 133; DRPSAMF ¶ 133.

On or about October 30, 2007, the Town hired a substitute, who had previously been the Deputy Town Clerk for the Town and knew the Town's financial software, to assist in the Town Office on a temporary basis.  PSAMF ¶ 134; DRPSAMF ¶ 134.  Town Manager Billings-Pezaris hired this substitute quickly even though she had not begun looking until after October 22, 2007 and the substitute was the first person she asked to provide temporary assistance.  PSAMF ¶ 135; DRPSAMF ¶ 135.

At no point either before or after his resignation did Mr. Willinghan provide medical records of any kind to the Town regarding the medical condition that led to his resignation.  DSMF ¶ 74; PRDSMF ¶ 74.  Mr. Willinghan offered to provide medical records to the Town but received no response and on January 24, 2008, Dr. Just wrote the Town that Mr. Willinghan's "medical condition has not prevented him from performing his essential job duties as Town Manager."  *Id.*[61]  Although

---

[61] The preceding sentences incorporate Mr. Willinghan's qualifications into the Town's paragraph 74.

Mr. Willinghan did not attempt to appeal the Board's request that he resign, the Board represents the highest authority within the Town and Mr. Willinghan did file a timely complaint with the Maine Human Rights Commission and with this Court.[62]  DSMF ¶ 75; PRDSMF ¶ 75.

## II.   THE PARTIES' POSITIONS

### A.   The Town's Contentions

The Town contends that Mr. Willinghan has failed to demonstrate that the Town took any "adverse action" against him, which the Town says is an essential element for a retaliation or discrimination claim.  *Def.'s Mot.* at 11.  The Town also maintains that Mr. Willinghan did not engage in "protected conduct" in requesting "reasonable accommodation" and that it did not terminate his employment.  *Id.* at 12.  Pointing to Mr. Willinghan's Employment Agreement with the Town, the Town contends that it did not have the contractual authority to summarily terminate his employment and would have been required to undertake a lengthy process before doing so.  *Id.* at 12-13.  To the extent Mr. Willinghan claims that he was constructively discharged, the Town cites case law that requires a hostile work environment, which, it contends, was not demonstrated on these facts.  *Id.* at 13.

The Town also says that Mr. Willinghan is not entitled to the protections of the law accorded to demands for reasonable accommodation because he never fairly apprised the Board of Selectmen of the specific nature of his back condition or the specific nature of his proposed accommodation.  *Id.* at 15.  Thus, the Town argues

---

[62] This statement melds the Town's and Mr. Willinghan's positions in paragraph 75.

that it was not required to undertake an "interactive process" about a vague disability and a nebulous accommodation demand.  *Id.* at 14-15.

The Town then turns to Mr. Willinghan's proposed accommodations.  *Id.* at 17.  It says that even if Mr. Willinghan provided a valid medical basis for his proposed reasonable accommodations, his proposals were "substantially unreasonable."  *Id.* at 17.  To constitute a "reasonable accommodation," the law, according to the Town, requires the employee to be able to perform the "essential functions" of his job.  *Id.*  In determining whether he could perform the essential functions, the Court is required, the Town says, to give substantial weight to the employer's judgment.  *Id.* at 17-18.

The Town contends that Mr. Willinghan's first proposed accommodation was to take an unspecified period of leave while he attempted further treatment of his back.  *Id.*  The Town says that as a matter of law taking an indefinite leave of absence is not reasonable.  *Id.*  The Town next addresses Mr. Willinghan's second proposed accommodation, namely that he be allowed to work at home at irregular hours and come to the office for scheduled appointments only.  *Id.* at 19.  The Town observes that attendance at work must be considered an essential part of any job and the Town could not have a Town Manager who was not "at the helm."  *Id.*  Nor is the Town required to accept a proposed accommodation that assigns portions of an employee's job duties to other employees.  *Id.* at 20.

28

### B.     Mr. Willinghan's Response

Mr. Willinghan first responds that, contrary to the Town's contentions, he made four, not two, suggestions for reasonable accommodations: (1) working from home part of the time with scheduled office hours and appointments in the Town Office; (2) taking unpaid medical leave pending his second epidural treatment which was scheduled for October 24, 2007; (3) taking unpaid medical leave for four to six weeks pending his surgical consultation; or (4) allowing the Town Clerk to fill in temporarily as Town Manager while his medical situation was clarified.  *Pl.'s Opp'n* at 2.

Second, Mr. Willinghan asserts that in support of its motion, the Town relies on disputed facts in its favor.  *Id.* at 5.  Specifically, he says that the Town relies on the disputed factual assertion that he "never even consulted with Dr. Just regarding whether any accommodations could permit him to perform his job."  *Id.* He notes that he testified directly to the contrary.  *Id.*  Similarly, although the Town claims that he asked for an unlimited period of medical leave, he testified that he repeatedly requested leave only until October 24, 2007 to see if the second epidural treatment was going to be successful and, if not, the four to six weeks to obtain the surgical consultation.  *Id.*

Third, Mr. Willinghan disputes the Town's assertion that to be actionable an employer must terminate or constructively discharge an employee.  *Id.* at 6.  He points to case law that allows an employee who has been relegated to menial tasks to claim adverse employment action.  *Id.* at 5-6.  He says that the Town's refusal to

accept any reasonable accommodation suggestions, its disclosure to him that it was considering terminating him, and its request for his resignation were all adverse employment actions. *Id.* at 6. Furthermore, he claims that a jury could find a constructive discharge in the Board's demand for his resignation. *Id.*

Fourth, Mr. Willinghan asserts that a jury could find that he made sufficiently specific and direct requests for reasonable accommodation. *Id.* at 7. He claims that his request for medical leave is a "well-established form of reasonable accommodation for an employee with a disability." *Id.* He maintains that the First Circuit rejected the Town's contention that because Mr. Willinghan could not identify when he would return, his request for accommodation was *per se* unreasonable. *Id.* (citing *Garcia-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 648 (1st Cir. 1998)). He contends that his request for unpaid medical leave was facially reasonable. *Id.* at 8-9. He also says that working home part of the time is also a "possible reasonable accommodation." *Id.* at 9. The question, from Mr. Willinghan's perspective, is whether he would still have been able to perform all the essential duties of the job. *Id.* Moreover, he argues that once he demanded reasonable accommodation, the Town had an obligation to make a reasonable effort to determine the appropriate accommodation. *Id.* at 10. He says that he is not required to show that the Town's motives were discriminatory. *Id.* at 10-11.

Finally, he claims that under Maine law, the Town violated Mr. Willinghan's right to a public discussion of his request for reasonable accommodation by entering into an executive session of the Board. *Id.* at 11.

C.     **The Town's Reply**

The Town replies that, his contentions to the contrary, Mr. Willinghan has not demonstrated he was fired or constructively discharged by the Town.  *Def.'s Reply* at 1-2.  It disputes Mr. Willinghan's characterization of *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 161-62 (2d Cir. 1998) and *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir. 1987), two Second Circuit constructive discharge cases.  *Id.* at 2-3.  It notes that Mr. Willinghan "was never threatened with being fired or a reduction in pay, much less had one of those actions taken against him." *Id.* at 3.

The Town further contends that Mr. Willinghan's reliance on Selectperson Duncan's discussion with the Maine Municipal Association is immaterial because there is "no evidence that the Board sanctioned, or was even aware of, the substance of Duncan's telephone conversation." *Id.*  The Town also disputes the applicability of the menial demotion case Mr. Willinghan cited. *Id.* at 4.

Regarding the reasonable accommodation claim, the Town says that Mr. Willinghan had a legal obligation to provide it with medical records supporting his requested accommodation. *Id.* at 4-5.  It objects to what it says is Mr. Willinghan's attempt to generate a factual dispute by contradicting his own physician, Dr. Just, and contends that Mr. Willinghan's attempt to characterize Dr. Just's recommendations is inadmissible hearsay. *Id.* at 5.  The Town views Mr. Willinghan's request for an indefinite leave as unreasonable as a matter of law and not supported by the case law. *Id.* at 6.  Finally, the Town contends that Mr.

Willinghan's request to work from home is not reasonable as a matter of law.  *Id.* at 6-7.

## III.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  For summary judgment purposes, "genuine" means that "a reasonable jury could resolve the point in favor of the nonmoving party," and a "material fact" is one whose "existence or nonexistence has the potential to change the outcome of the case." *Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (citations omitted).  Once the moving party has made this preliminary showing, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999); *see also* FED. R. CIV. P. 56(e).

Although the Court "view[s] the evidence in the light most favorable to the nonmovant, 'as to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party.'" *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (internal punctuation and citation omitted).  "Even in employment discrimination cases where elusive concepts such as motive or intent are at issue, summary judgment is appropriate if the non-moving party rests merely upon conclusory allegations,

improbable inferences, and unsupported speculation." *Benoit v. Technical Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir. 2003) (citation omitted).

## IV.   DISCUSSION

Mr. Willinghan is proceeding under three statutory causes of action: (1) Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; (2) Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12134 (ADA); and (3) the Maine Human Rights Act, 5 M.R.S. §§ 45551-4634 (MHRA). *See Compl.; see also Order on Def.'s Mot. to Dismiss Pl.'s Fed. Claims* (Docket # 9). The parties agree there are no differences among these three statutes relevant to the resolution of this motion. Accordingly and for ease of discussion, the Court applies the ADA analysis to all three of Mr. Willinghan's claims. *See Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 12 n.1 (1st Cir. 2004) ("The same standards . . . apply to claims under the ADA and under the Rehabilitation Act"); *Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 312 (1st Cir. 2003) ("It is settled law that the MHRA should be construed and applied along the same contours as the ADA").

### A.    The ADA Standard

Mr. Willinghan claims that the Town violated the ADA because it did not make reasonable accommodations for his disability, it retaliated against him for requesting reasonable accommodations, and it discriminated against him because of his disability by constructively discharging him from his position.

Title II of the ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of

employees, employee compensation, job training, and other terms, conditions, and privileges of employment."[63]   42 U.S.C. § 12112(a).   Discrimination includes "not making reasonable accommodations to the known physical . . . limitations of an otherwise qualified individual with a disability who is an . . . employee."   *Id.* § 12112(b)(5)(A); *see Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002).   "The ADA also prohibits retaliation against 'any individual because such individual has opposed any act or practice made unlawful' by the ADA."   *Valle-Arce v. Puerto Rico Ports Auth.*, 651 F.3d 190, 198 (1st Cir. 2011) (quoting 42 U.S.C. § 12203(a)).

## B.   Reasonable Accommodations

It is the plaintiff's burden to show that reasonable accommodations were available.   *Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121, 136 (1st Cir. 2009) (citing 42 U.S.C. § 12112(b)(5)(A)).   "More specifically, the plaintiff's burden under the ADA is 'to show not only that the proposed accommodation would enable her to perform the essential functions of her job, but also that, at least on the face of things, it is feasible for the employer under the circumstances.'"   *Id.* (quoting *Reed v. LePage Bakeries*, 244 F.3d 254, 259 (1st Cir. 2001)).   Thus, to make a case that the employer failed to reasonably accommodate a disability, the employee "bears the burden of proposing an accommodation that would enable him to perform his job effectively and is, at least on the face of things, reasonable."   *Gomez-Gonzalez v. Rural*

---

[63] The Town does not dispute that Mr. Willinghan is a qualified individual under the ADA.

*Opportunities, Inc.*, 626 F.3d 654, 665 (1st Cir. 2010) (quoting *Kvorjak v. Maine*, 259 F.3d 48, 55 (1st Cir. 2001)).

### 1.   Were   Mr.   Willinghan's   Proposed   Accommodations Reasonable?

The Town says that when he approached the Board for accommodations, Mr. Willinghan made two proposals, neither of which was reasonable as a matter of law: (1) working mostly from home, or (2) an indefinite unpaid medical leave.

Under the ADA, the employee must demonstrate that, with reasonable accommodations, he is "able to perform the essential functions of the position." *Richardson v. Friendly Ice Cream Corp.*, 594 F.3d 69, 75 (1st Cir. 2010); *see also* 29 C.F.R. § 1630.2(o)(1)(ii) ("The term reasonable accommodation means . . . [m]odifications or adjustments to the work environment . . . that enable a qualified individual with a disability to perform the essential functions of that position"). The First Circuit has explained that "[a]n essential function is, at its most basic level, one that is 'fundamental' to a position rather than 'marginal.'" *Id.* The Equal Employment Opportunity Commission has promulgated implementing regulations pursuant to the ADA that list three nonexclusive reasons a job function may be considered essential:  (1) the position exists for the purpose of performing the function, (2) there are a limited number of employees among whom responsibility for the function can be distributed, and/or (3) the function is highly specialized and the incumbent was hired for his or her expertise or ability to perform it.  *Id.* (citing 29 C.F.R. § 1630.2(n)(2)).  It is the employer's burden "to come forward with some evidence" that a particular function is essential, *Tobin*, 433 F.3d at 107, and courts

traditionally "give substantial weight to the employer's view of job requirements." *Mulloy v. Acushnet Co.*, 460 F.3d 141, 147 (1st Cir. 2006) (quoting *Ward v. Mass. Health Research Inst., Inc.,* 209 F.3d 29, 34 (1st Cir. 2000)).

### a.  Work-from-Home Accommodation Proposal

Responding to Mr. Willinghan's proposal to work from home and to only come to the Town Office for scheduled appointments, the Town says the proposal is not a reasonable accommodation for a town manager. *Def.'s Mot.* at 19-20.  First, it observes that "at the risk of stating the obvious, attendance is an essential function of any job." *Id.* (quoting *Rios-Jimenez v. Principi*, 520 F.3d 31, 42 (1st Cir. 2008)). It also discounts Mr. Willinghan's home-work proposal, saying that it is without record support. *Id.*  Furthermore, Stonington maintains that Mr. Willinghan's suggestion to have Ms. Billings-Pezaris, the Town Clerk, substitute is unreasonable as a matter of law because the employer cannot be required to "reallocate [essential] functions to other workers." *Id.* at 20 (quoting *Rios-Jimenez*, 520 F.3d at 42).

Here, the record is insufficient for the Court to conclude that Mr. Willinghan could not demonstrate that he could have performed the essential functions of the Town Manager position with a combination of home and office work.  First, when Mr. Willinghan made the accommodation requests on October 15 and October 22, 2007, his medical situation was uncertain.  He was scheduled to see Dr. Just on October 24, 2007 for a second epidural injection and he requested that the Board wait until then before making a final decision.  Thus, the immediate request for accommodation was only for two days and there is nothing in the record that

suggests Mr. Willinghan's position as Town Manager was so critical that a two-day period of home and office work would not have been reasonable.  *See Ward*, 209 F.3d at 35 ("Based on this record, a reasonable factfinder could conclude that a regular and predictable schedule is not an essential function of [employee]'s position so long as he works the requisite 7.5 hours per day").

Second, the record contains very little information about the exact duties of a Town Manager and why the Town Manager's presence at the Town Office during the entire work day is an essential function of the job.  Mr. Willinghan proposed to work at home, about one mile from the Town Office, and to come to the Town Office for scheduled appointments and be available if necessary.  Other than a generic understanding of what someone with the title of Town Manager does, there is very little information in the record as to what the Town of Stonington expected of Mr. Willinghan.  *See Richardson*, 594 F.3d at 75-76 (listing the types of evidence bearing on the essential job function analysis as including the employer's judgment of essential functions, written job descriptions, the amount of job time spent on the functions, the consequences of not requiring the incumbent to perform the function, the work experience of past incumbents, and the current experience of incumbents in similar jobs).  It is unclear why the Board concluded that Mr. Willinghan's proposal was so unreasonable.  It could be that in Stonington—a small coastal community with a minimal municipal staff, a vibrant harbor, and a burgeoning summer population—the Town Manager's continual physical presence in the Town Office is, in fact, an essential part of the job.  But if so, the record on this motion

falls well short of demonstrating this.  As the First Circuit has noted, the "complex question of what constitutes an essential job function involve[s] fact-sensitive considerations and must be determined on a case-by-case basis." *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 25 (1st Cir. 2002).  On this record, summary judgment on the reasonableness of Mr. Willinghan's work-from-home proposal is inappropriate.

### b.    Medical Leave Accommodation Proposal

Mr. Willinghan's second proposal was for unpaid medical leave.  The Town argues that an indefinite period of leave "fails for lack of specificity." *Def.'s Mot.* at 18.  The Town cites an Eighth Circuit case in which an employee's request for an accommodation during the indeterminate length of her recovery from surgery was deemed unreasonable. *Peyton v. Fred's Stores of Ark., Inc.*, 561 F.3d 900, 901 (8th Cir. 2009).  Mr. Willinghan replies that the Town had a provision in its personnel policy that allowed for discretionary unpaid leaves of absence for up to sixty days and that the Town is in a difficult position to deny that its own provision is unreasonable. *Pl.'s Opp'n* at 8 (citing *Criado v. IBM Corp.*, 145 F.3d 437, 444 (1st Cir. 1998)).  Second, Mr. Willinghan says the law in the First Circuit is different.  He quotes language from *Garcia-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638 (1st Cir. 2000):

> Some employees, by the nature of their disability, are unable to provide an absolutely assured time for their return to employment, but that does not necessarily make a request for leave to a particular date indefinite.  Each case must be scrutinized on its own facts.  An unvarying requirement for definiteness again departs from the need for individual factual evaluation.

38

*Garcia-Ayala*, 212 F.3d at 648.

Finally, one view of the facts is that Mr. Willinghan was not asking for an indefinite leave but a leave only "until we found out exactly what the situation would be"—a date which could have been four to six weeks in the future when he was hoping to see an orthopedic surgeon or could have been as early as two days from October 22, 2007, when he was scheduled for a second epidural treatment. DSMF ¶ 48; PRDSMF ¶ 48.  On balance, the Court concludes that Mr. Willinghan has raised a genuine issue of material fact as to whether his request for unpaid leave was a reasonable accommodation.

### 2. Did Mr. Willinghan Fairly Apprise the Board of His Disability?

The Town contends that Mr. Willinghan's reasonable accommodation claim must fail because he did not present the Board with medical confirmation about the nature of his back condition and the precise contours of his work restrictions.  *Def.'s Mot.* at 15-17.  The Town cites case law that stands for the sensible proposition that an employer cannot be expected to accommodate a vague or ill-defined disability.  *Id.* at 16.  According to Stonington, Mr. Willinghan's claim must fail as a matter of law because he did not provide the Town with any medical documentation of the nature of his back injury and doctor-imposed restrictions.  *Id.* at 17.  Furthermore, the Town contends that Dr. Just's notes confirm that on October 18, 2007, he told Mr. Willinghan that he should not work at all, which, if correct, would mean that

Mr. Willinghan's suggestion of a modified home-office work schedule violated his own doctor's orders and could not be deemed reasonable.  *Id.*

The Town is certainly correct that an employee cannot demand an accommodation and then fail or refuse to provide the employer with information critical to determining whether the accommodation is necessary and reasonable. This is especially true when the parties are attempting to engage in the "interactive process" contemplated by the ADA, which requires participation by both parties. *See* 29 C.F.R. § 1630.2(o)(3); *Templeton v. Neodata Servs.*, 162 F.3d 617, 619 (10th Cir. 1998); *Steffes v. Stepan*, 144 F.3d 1070, 1073 (7th Cir. 1998).  At the same time, if there is a dispute between the parties as to whether the breakdown in the interactive process was caused by the employee's failure to produce medical reports or the employer's failure to ask for them, the factual dispute must be resolved by a factfinder, which precludes summary disposition.  *Parker v. Sony Picture Entm't, Inc.* 260 F.3d 100, 113-14 (2d Cir. 2001).

Here, the Court easily concludes there are genuine issues of material fact. First, although the Town now asserts that medical confirmation was so critical that the claim must fail as a matter of law, the Town never claimed that Mr. Willinghan's back condition was factitious or exaggerated; to the contrary, the Town agrees that Mr. Willinghan was honest and that the Selectmen believed his oral reports about his medical situation.  PSAMF ¶ 138; DRPSAMF ¶ 138.  In view of these concessions, it is unclear why the Town had to have medical notes corroborating what it already believed.  Second, although it is true that Mr.

Willinghan did not present the Town with medical records before his resignation, it is also true that the Town did not ask him for them.  DSMF ¶ 51; PRDSMF ¶ 51. Third, when the Town received Dr. Just's office notes, they confirmed that on October 10, 2007 the doctor had told him not to work; yet, one of Mr. Willinghan's suggested accommodations was for an unpaid leave of absence, which is consistent with the doctor's note.  Fourth, the parties wrangle about what Dr. Just said during his deposition about the meaning of his note and whether he had in fact restricted Mr. Willinghan from the physical activity inherent in Mr. Willinghan's home-office proposal.  Fifth, when the Town demanded Mr. Willinghan's resignation, it did not condition its demand on physician corroboration.

In essence, the Board seemed to accept at face value that Mr. Willinghan was suffering from a significant—perhaps even in his words "catastrophic"—back injury, and there is nothing in the record to show that the Board was stymied by the absence of a doctor's note.  At the very least, a factfinder should determine whether the Board contemporaneously required the medical documentation or whether the issue is purely a retrospective attempt to fit the facts into convenient case law.  In either case, Stonington's dispositive motion must fail on this point because there are genuine issues of material fact as to Mr. Willinghan's reasonable accommodation claim.

## C.   Retaliation and Constructive Discharge

The ADA also prohibits retaliation against "any individual because such individual has opposed any act or practice made unlawful" by the ADA.  42 U.S.C.

§ 12203(a). "To establish a claim of retaliation, a plaintiff must show that (1) she engaged in protected conduct, (2) she suffered an adverse employment action, and (3) there was a causal connection between the protected conduct and the adverse employment action." *Valle-Arce*, 651 F.3d at 198. "Requesting an accommodation is protected conduct for purposes of the ADA's retaliation provision." *Id.* (quoting *Freadman v. Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 106 (1st Cir. 2007)). "[T]ermination of employment obviously is an adverse employment action," and "very close temporal proximity between the protected action by the employee and the adverse employment action by the employer may give rise to an inference of causation." *Id.* at 198-99.

The Town maintains that it did not take an adverse employment action against Mr. Willinghan because Stonington did not terminate Mr. Willinghan; he resigned. The law regards an employee who resigns as having been fired if he can show that he was "constructively discharged." *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 119 (1st Cir. 1977). "[I]n order for a resignation to constitute a constructive discharge, it effectively must be void of choice or free will." *Torrech-Hernandez v. Gen. Elec. Co.*, 519 F.3d 41, 50 (1st Cir. 2008). In other words, an employee "must show that, at the time of his resignation, his employer did not allow him the opportunity to make a free choice regarding his employment relationship." *Id.*; *see Vega v. Kodak Caribbean, Ltd.,* 3 F.3d 476, 480 (1st Cir.1993) (constructive discharge exists where employer's actions "effectively vitiate the employees' power to choose work over retirement"). Furthermore, the standard "is an objective one; it

42

cannot be triggered solely by an employee's subjective beliefs, no matter how sincerely held." *Roman v. Potter*, 604 F.3d 34, 42 (1st Cir. 2010) (citation omitted).

In *Ahern v. Skinseki*, 629 F.3d 49 (1st Cir. 2010), the First Circuit instructed that "a plaintiff who seeks to withstand summary judgment on a claim of constructive discharge must point to evidence in the record showing that, as a result of discrimination, her 'working conditions were so difficult or unpleasant that a reasonable person in her shoes would have felt compelled to resign.'" *Id.* at 59 (quoting *Marrero v. Goya of Puerto Rico, Inc.*, 304 F.3d 7, 28 (1st Cir. 2002); *Dykstra v. First Student, Inc.*, 324 F. Supp. 2d 54, 67-68 (D. Me. 2004). "When an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns, the employer's conduct may amount to constructive discharge." *Torrech-Hernandez*, 519 F.3d at 50-51 (quoting *Equal Emp't Opportunity Comm'n v. Univ. of Chicago Hosps.,* 276 F.3d 326, 332 (7th Cir.2002)); *see also Torrech-Hernandez* at 51 ("constructive discharge protects the employee who 'decides to quit rather than wait around to be fired'") (quoting *Bragg v. Navistar Int'l Transp. Corp.*, 164 F.3d 373, 377 (7th Cir. 1998)).

The Court agrees with the Town that Mr. Willinghan's case does not begin to meet the types of hostile work environments that the First Circuit has typically required. Nevertheless, the Court views Mr. Willinghan's position as Town Manager as unusual. As Town Manager, Mr. Willinghan was uniquely beholden to the Board of Selectmen for his initial appointment and continued employment. The Board often acts as a buffer between the demands of the general public and the

43

fiscal and legal constraints on municipal action. To do his job, Mr. Willinghan had to work closely with the members of the Board on an array of potentially controversial issues and, to fulfill their obligations, the Board members had to work closely with him. Without a supportive Board of Selectmen, a Town Manager cannot properly perform the job and, as Town Managers know, when the Board of Selectmen or Town or City Council demands the chief municipal executive's resignation, the manager must leave. Other factors supporting a finding of constructive discharge include: (1) the timing of the resignation request; (2) the unanimity of the request; and (3) the absence of any Board response other than the resignation request.

Even though Mr. Willinghan could have stood his ground, insisted on the letter of his Employment Agreement, demanded the Board demonstrate the basis for a "for cause" termination, held on through the due process hearing, and, if successfully ousted, received ninety days termination pay, the fact that he elected— on unanimous demand—to immediately resign and give up his continuing salary and severance pay tends to confirm his position that, as a practical matter, he had no choice. To hang on would have been arguably worse for Stonington, worse for the Board, and ultimately worse for Mr. Willinghan.

This does not mean that Mr. Willinghan will be able to convince a jury that in his circumstances, "a reasonable person would have felt compelled to resign." *Ahern*, 629 F.3d at 59. A jury might well hold Mr. Willinghan to some of the words in his resignation letter: that he resigned because of his "present physical condition,

44

the advice of [his] medical advisors [and] [his] obligation to the Town of Stonington."
DSMF ¶ 70; PRDSMF ¶ 70.  Alternatively, the jury may focus on the last phrase of
the resignation letter:  "and at the request of the Select Committee."  *Id.*  The jury
may find that, even though the Board asked for his resignation, he should not have
so readily acquiesced and should have at least attempted to salvage his relationship
with the Board and his job, or the jury could conclude that his immediate
resignation was a capitulation to the inevitable.

All of this means that he has raised a jury question.  "Constructive discharge
is a heavily fact-driven determination."  *Stremple v. Nicholson*, 289 Fed. Appx. 571,
574 (3d Cir. 2008).  As the First Circuit made clear in *Feliciano-Hill v. Principi*, 439
F.3d 18 (1st Cir. 2006), "[t]he question whether a work environment is sufficiently
hostile to create liability is best left to a jury."  *Id.* at 27 (citing *Che v. Mass. Bay
Trans. Auth.*, 342 F.3d 31, 40 (1st Cir. 2003)).  In the circumstances of this case, the
Court finds that Mr. Willinghan has raised a factual question as to whether his
resignation was compelled by the unanimous demand of the Board of Selectmen
that he tender his resignation, thus constituting constructive discharge.

Because genuine issues of material fact remain as to Mr. Willinghan's claims
of denial of reasonable accommodation and retaliation, the Court concludes that
summary judgment is inappropriate.

## V.   CONCLUSION

The Court DENIES the Town of Stonington's Motion for Summary Judgment
(Docket # 26).

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE


Dated this 7th day of March, 2012